Erwin SUSSMAN and Ira Guilden, deceased, By and Through Paul Guilden, His Personal Representative, Plaintiffs,

v.

BANK OF ISRAEL, Ministry of Finance of the Government of Israel, Bank Hapoalim, Ltd., Moses Mandelbaum, Galia Maor, Zeev Eveles, and John Does 1–5, Defendants.

No. 91 Civ. 4091 (CSH).

United States District Court, S.D. New York.

July 17, 1992.

Miller, Cassidy, Larroca & Lewin, Washington, D.C. (Nathan Lewin, Seth P. Waxman, Michael J. Barta, of counsel), Schlam, Stone & Dolan, New York City (Richard H. Dolan, of counsel), for plaintiffs.

Skadden Arps Slate Meagher & Flom, New York City (Jonathan J. Lerner, Marco E. Schnabl, John M. Horan, Craig S♦ Hilliard, Joan K. Martin, Angela G. Garcia, of counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Erwin Sussman is a citizen of Sweden and a legal permanent resident of the State of California. Plaintiff Ira Guilden, deceased, was a citizen of the United States and a resident of the State of New York. Upon his death in November 1984 Paul Guilden, a United States citizen and a resident of New York, became the personal representative of Ira Guilden.

At the pertinent times plaintiffs were two of the principal investors in North American Bank ("NAB"), a financial institution incorporated in Israel in 1977 and liquidated in 1988 by Israeli authorities after the discovery of fraud perpetrated by its Israeli managers. Plaintiffs allege that the demise of NAB caused them to lose the full amount of their investments, $10 million in the case of plaintiff Sussman and $7 million in the case of plaintiff Guilden.

By this action plaintiffs seek to recover those amounts in compensatory damages together with $20 million in punitive damages. The named defendants are the Bank of Israel ("BOI") and the Ministry of Finance of the Government of Israel (the "Ministry"), both agencies of the Government of Israel; Bank Hapoalim, Ltd. ("Hapoalim"), a large Israeli private financial institution which maintains a branch in New York City; Moses Mandelbaum, an Israeli citizen and resident and at the pertinent times Governor of BOI; Galia Maor, an Israeli citizen and resident and at the pertinent times Supervisor of Banks at BOI; Zeev Abeles, an Israeli citizen and resident who is currently Deputy Supervisor of Banks at BOI and at the pertinent times held other offices in that agency[1] The "John Doe" defendants 1–5 are included because plaintiffs allege, upon information and belief, that additional unknown individuals took part in the fraudulent conspiracy alleged in the complaint.

All defendants now move to dismiss the action on the ground of forum non conveniens. In the alternative, defendants move to dismiss the complaint or for summary judgment on various substantive grounds.

### Background

The complaint alleges that plaintiffs Sussman and Guilden were in a group of three non-Israeli investors who provided substantial funds in 1977 for the creation of NAB. They did so, they allege, on the basis of representations that BOI would

---

**1.** The complaint spells this defendant's last name "Eveles." The defendant says the proper English transliteration of his Hebrew surname is "Abeles," and I adopt that spelling in this Opinion.

oversee the affairs of NAB and detect and prevent fraud.

The complaint alleges that in October 1983, the Israeli banking industry suffered a nation-wide crisis which came to be known as the "Bank Share Crisis." The crisis involved the precipitous decline in the price of the publicly held shares of Israeli banks, which were traded on the Tel Aviv stock market. The complaint alleges that BOI "among others" ascribed the falling bank share prices to a downward adjustment reflecting the true economic value of bank stock, after prices had been artificially inflated by years of manipulative transactions. Specifically, the manipulative transactions consisted of substantial purchases by a bank, or an individual acting for a bank, of the bank's own stock. Such purchases inflated the trading value of the bank's stock, thereby preserving or increasing the value of existing shares. They also had the effect of disguising the price at which the bank's stock would trade in honest arm's length transactions. Such manipulative transactions in bank stocks are known in Israel as "visut". Complaint ¶ 25.

The Bank Share Crisis in October 1983 necessitated intervention by the Government of Israel. Trading in bank stocks was temporarily suspended. BOI encouraged banks to enter into an arrangement under which most public holders of bank stock would agree to hold their stock for a stated period, generally six years. In consideration of that forbearance, the stockholders covered by the arrangement were guaranteed the right to redeem their shares, at the conclusion of the prescribed period, for a fixed price equal to its trading value as of the date of the guarantee, which was October 6, 1983. The Government designed this arrangement as a device "to buy time to enable the economic value of the bank shares to catch up with their artificially inflated trading prices." *Id.* at ¶ 25.

The complaint goes on to allege that for unstated reasons, that arrangement, which was applied to "almost all other Israeli banks," was not applied to NAB. Instead, in order to keep the price of NAB's stock artificially inflated without assuming the obligations of a guarantee, the Ministry, BOI, and NAB's Israeli management agreed on a plan whereby U.S. $10 million would be provided by the Ministry through the New York branch of defendant Hapoalim to NAB Holding Corporation, a Luxembourg company owned by the principal shareholders of NAB (including plaintiffs), and controlled in fact by the Israeli managers of NAB. The complaint alleges that when this secret loan was arranged, defendants knew that the proceeds of the loan would be used by the Israeli managers of NAB, thereby circumventing the prohibition of Israeli law against a bank's purchase of its own shares. Plaintiff Sussman, the complaint alleges, had traveled to Israel in October for the purpose of spending the Jewish holidays in that country. Defendants Mandelbaum and Maor are alleged to have falsely reassured Sussman at a meeting on October 18, 1983 concerning NAB's condition and the integrity of its Israeli management. Sussman told unidentified officials of BOI and the Ministry that in view of those reassurances, he did not intend to sell his shares.

The secret $10 million loan was agreed upon during meetings between representatives of the Ministry, BOI, and NAB's Israeli management on October 19 and 20, 1983. Sussman was not told that the loan was provided to enable stock manipulation to continue. On October 24, 1983 the loan, funded by the Ministry with the knowledge, approval and assistance of BOI, was processed through the New York City branch of Bank Hapoalim to NAB Holding Corp., and thence back to the NAB managers in Israel. Ultimately the Israeli managers of NAB used some of the proceeds to purchase shares of NAB in order to maintain the inflated price of the stock. Complaint at ¶¶ 27–34. The complaint further alleges that BOI officials including Maor were warned by BOI regulators that NAB was carrying out a prohibited visut practice, but disregarded that advice. *Id.* at ¶ 37.

Broadening its scope, the complaint goes on to allege a series of acts of fraud and

mismanagement by NAB's Israeli managers, Moshe Stern, Josusha Halperin, and Hadassah Monsah. Episodes are alleged beginning in 1979 and extending through April 1985, at which time NAB had become "hopelessly insolvent." *Id.* at ¶ 51. Unnamed BOI employees, as well as defendant Maor, are charged with failure to respond to warning signals, "and deliberately or recklessly allowing the fraudulent scheme to flourish." *Id.* at 43. BOI took over NAB on August 13, 1985. The official receiver was appointed as liquidator of a court-ordered liquidation of NAB on January 5, 1988. In consequence, plaintiffs have lost the full value of their investments. Criminal prosecutions were begun against Stern, Halperin, and Monsah, together with Samuel Barzel, an attorney for NAB. In addition, on May 1, 1989 the liquidator initiated civil proceedings against NAB's foreign shareholders, including plaintiffs Sussman and Guilden. Sussman and Guilden have filed answers and third-party claims in that civil action, asserting at least some of the claims contained in the complaint at bar.[2]

The complaint at bar asserts five claims against all defendants. The first is for fraud and misrepresentation. The "defendants" (unspecified) are charged with having made false statements of facts to plaintiffs "[o]n October 18, 1983, in Jerusalem, and thereafter," including assurances by "the defendants" that NAB was financially sound and well managed; plaintiff had no cause for concern about their investments; and BOI was exercising diligent oversight over NAB's affairs and had not uncovered any irregularities in the bank's management. These false statements were allegedly made to cover up the secret $10 million loan provided to continue stock manipulation by NAB's managers, and for the purpose of inducing plaintiffs to maintain their NAB investments. Plaintiffs allege that the "defendants" concealed the true facts from plaintiffs until those facts were revealed during Halperin's criminal trial in 1990. Plaintiffs allege they did not know

the true facts until they conducted an investigation based upon (the) evidence elicited during Halperin's trial. Complaint at ¶¶ 60–64.

The four other claims, also against all defendants, proceed from this same nexus of alleged facts. Those claims are for negligent misrepresentation, concealment, breach of a duty to disclose and restitution.

As noted, all defendants move to dismiss the complaint on the ground of forum non conveniens. They say that the civil courts of Israel furnish the appropriate forum for plaintiff's claims. In the alternative, defendants or some of them assert that the complaint should be dismissed on the grounds of the statute of limitations, sovereign immunity, the act of state doctrine, lack of personal jurisdiction, and failure to plead fraud with the specificity required by Rule 9(b), Fed.R.Civ.P.

If defendants' forum non conveniens motion is well founded, I need not and should not reach the other issues.

### Discussion

■ A district court has broad discretion in deciding whether to dismiss an action on the ground of forum non conveniens. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266–67, 70 L.Ed.2d 419 (1981); *Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir.1991).

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), sets forth private and public interest factors which the district court should consider. Private interests include "the ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 508. Public interest factors include administrative difficulties stemming from court congestion; the interest in having "localized controversies decided at home";

---

**2.** Notwithstanding plaintiffs' protestations to the contrary, examination of the pleadings shows that both plaintiffs' answers and third-party claims in the Israeli civil action contain allegations of fraud on the part of BOI and others that parallel their allegations at bar.

and the interest in having issues of foreign law decided by a foreign tribunal. *Id.* at 508–09. "The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice." *Maganlal,* 942 F.2d at 167. A defendant seeking to dismiss a complaint on forum non conveniens "must demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors set forth in *Gilbert,* . . . the balance of convenience tilts strongly in favor of trial in the foreign forum." *Id.*

 At first blush, the private and public factors in the case at bar would appear to tilt powerfully in favor of trial of plaintiff's claims in Israel. But plaintiffs stress a number of considerations. They say that their status as an American citizen (Guilden) and an American resident (Sussman) are entitled to considerable deference; that the key operative aspect of the alleged fraud occurred in New York; that New York law governs the case; that the trial will be relatively simple, turning upon the credibility of a few witnesses; and that they cannot get a fair hearing in the Israeli courts. I will consider these contentions in turn.

### Citizenship

*Piper Aircraft,* arising out of a plane crash in Scotland, involved an action brought in federal district court by foreign plaintiffs against American defendants, companies that manufactured the aircraft and its propellers. The district court granted defendants' forum non conveniens motion, having concluded that Scotland was the appropriate forum. The Third Circuit reversed, but the Supreme Court reinstated the district court's judgment. As the Court observed at 454 U.S. at 255, 102 S.Ct. at 265–66, the district court "acknowledged that there is ordinarily a strong presumption in favor of the plaintiff's choice of forum," but also held "that the presumption applies with less force when the plaintiff or real parties in interest are foreign." The Court said that this "distinction between resident or citizen plaintiffs and for-

eign plaintiffs is fully justified," *citing Koster v. Lumberman's Mutual Casualty Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 831–32, 91 L.Ed. 1067 (1947), for the proposition that "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum." *Id. Koster* affirmed the forum non conveniens dismissal of a derivative suit brought by a plaintiff policy holder in his home district against an Illinois mutual insurance company alleging breaches of trust in the management of the company's affairs. The Court reached that result, notwithstanding its general observation 330 U.S. at 524, 67 S.Ct. at 832 that "[i]n any balances of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown."

 In the case at bar, the Southern District of New York is not plaintiff Sussman's home forum. Sussman is a Swiss citizen and a California resident. To participate in a trial of his claims, Sussman must travel from California to New York or to Israel. The case is analogous to *Mediterranean Golf, Inc. v. Hirsh,* 783 F.Supp. 835, 842 (D.N.J.1991), where the district court said:

> In this case, Mediterranean Golf [a co-plaintiff] is a Delaware corporation with its principal place of business in Florida and Jones [the other plaintiff] is a resident of Florida. Therefore, New Jersey is a foreign forum to the Plaintiffs. Accordingly, the plaintiffs' choice of forum is entitled to less deference and the Plaintiffs must make more of a showing of convenience to be accorded the same treatment as a home state plaintiff."

As for co-plaintiff Guilden, Paul Guilden sues in a representative capacity, Ira Guilden having died. Arguably this dilutes the deference accorded to a home state plaintiff, although the Guilden estate is being administered in New York, an administration that has been delayed by the pendency of the Israeli liquidator's civil action in Israel against the non-Israeli NAB investors.

However, I need not pursue this subject further because, assuming plaintiffs at bar are entitled to array themselves in the fully panoply of a home state litigant, the Supreme Court made it plain in *Piper Aircraft* that this is not a dispositive factor. The Court was careful to observe 454 U.S. at 256 n. 23, 102 S.Ct. at 266 n. 23:

> A citizen's forum choice should not be given dispositive weight, however.... Citizens or residents deserve somewhat more deference than foreign plaintiffs, but dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper.
>
> (citations omitted).

On more than one occasion the Second Circuit has affirmed forum non conveniens dismissal requiring litigation abroad of a claim by an American citizen or a party holding that status. *See Alcoa Steamship Co. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir. *en banc*), *cert. denied*, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980) (suit by American corporation, courts of Trinidad held to be more appropriate forum); *Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880 (2d Cir.1978) (Iranian citizen enjoyed status of American citizen by treaty, courts of Iran held to be more appropriate forum). In *Alcoa* the second circuit said of its decision in *Farmanfarmaian:* "We concluded that American citizenship alone is not a barrier to dismissal on the ground of forum non conveniens and that *Gilbert* still provides the controlling standard." 654 F.2d at 152. *Alcoa* and *Farmanfarmaian* predate *Piper Aircraft*, but I do not understand *Piper Aircraft* to modify forum non conveniens analysis based upon the *Gilbert* factors. Indeed, *Piper Aircraft's* footnote 23 shows that it does not.

■ Where an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against forum non conveniens dismissal is diminished. That common sense proposition is illustrated by *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944 (1st Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). Plaintiff purchased shares of a Canadian corporation in Canada. He commenced an action under United States securities laws for misrepresentations and violations of fiduciary duty, claiming to represent a class of 2,500 American shareholders. The district court dismissed the complaint on forum non conveniens grounds, holding that Canada was the appropriate forum. The First Circuit, beginning its analysis with references to *Piper Aircraft* and *Gilbert*, 946 F.2d at 950, rejected the argument of plaintiff and the SEC as *amicus curiae* that federal securities law "seeks so strongly to protect Americans who bought their shares *abroad* from misrepresentations (or violations of fiduciary duty) primarily taking place *abroad* that a court may not require an American shareholder to bring his case abroad in a nation that offers its shareholders roughly equivalent legal protections." *Id.* at 953 (emphasis in original). That reasoning applies to the case at bar *a fortiori*, since plaintiffs assert common law fraud claims, and do not invoke the federal securities laws.

■ The doctrine of international comity may also militate against litigation in this country when an American citizen has voluntarily conducted business in a foreign country, and parallel litigation is proceeding abroad. Thus in *Cornfeld v. Investors Overseas Services, Ltd.*, 471 F.Supp. 1255 (S.D.N.Y.), *aff'd* 614 F.2d 1286 (2d Cir. 1979), this Court dismissed an indemnity action for the recovery of litigation expenses incurred by an American citizen in his capacity as a former officer and director of a Canadian corporation then undergoing liquidation under Canadian law. Judge Werker dismissed the action in deference to the Canadian proceeding, citing such authorities as *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), and *Canada Southern Railway v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed.

1020 (1883). He observed at 471 F.Supp. 1255 at 1260–61: "The fact that Cornfeld may be a New York citizen is inconsequential, for Cornfeld voluntarily associated himself with and indeed controlled IOS for many years." The case is analogous to that at bar because NAB is in liquidation in the Israeli courts.

In short, it remains the burden of the defendants at bar to demonstrate that Israel is a more appropriate forum for plaintiff's claims. But plaintiff's American citizenship and residence do not constitute the powerful, near-decisive factors for which they contend.

### The Situs of the Fraudulent Acts

Plaintiffs begin their recitation of facts by saying that this action "arises out of a commercial loan made in New York in October 1983 to the managers of NAB ..." Main Brief at 6. From that perception plaintiffs derive a "compelling" public interest in this forum "growing out of the New York transaction." *Id.* at 30.

Contrary to plaintiff's characterization, adopted for tactical purposes, it is far more accurate to say that this action arises out of alleged fraudulent acts and breaches of fiduciary duty occurring entirely in Israel. According to plaintiffs' theory, it was in Israel that the defendants hatched their illegal scheme. It was in Israel that the defendants misled Sussman with respect to their intentions and the true state of NAB's financial health. It was in Israel that NAB's Israeli managers made use of the proceeds of the loan, allegedly in violation of Israeli law. In short, the alleged conspiracy was made in Israel by Israelis for Israeli consumption. The use of its New York branch by one of the defendants, Bank Hapoalim, to route the loan proceeds from Israel to NAB Holding Corp. in Luxembourg and then back to the NAB managers in Israel cannot be regarded, in the overall scheme of things, as other than peripheral. That is so even if this routing of the funds was for the purpose of evading Israeli law. Israel's public interest in

this alleged conduct is far greater than that of the State of New York.

### Governing Law

■ For comparable reasons, I cannot accept plaintiff's contention that "American law, rather than Israeli law governs this action." Main Brief at 35. Plaintiffs rely for that proposition on the fact that they felt the economic impact of defendants' alleged fraud in the United States: California in the case of Sussman, New York in the case of Guilden. Plaintiffs rely upon a line of cases of which *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir.1977) is typical. *Arneil* was an action for federal securities fraud. Defendant pleaded the statute of limitations. The Second Circuit said of the state of law then existing: "Because the provisions of the federal statute sued upon do not specify a limitations period, this court, in determining whether the action is timely brought, must refer to the statute of limitations of the forum state, New York." 550 F.2d at 779.[3]

For forum non conveniens analysis, the more relevant choice of law question is what constitutes a cause of action, rather than when it must be sued upon (always a forum law question in the absence of a controlling statute). This court must consider New York choice of law rules. However, contrary to plaintiff's contention, the law of the states where plaintiffs suffered economic loss as the result of defendants' alleged conduct does not furnish the controlling law on the propriety of that conduct.

In *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985), the New York Court of Appeals referred to the seminal case of *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), which held that "controlling effect" must be given "to the law of the jurisdiction, which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation," an approach referred to as "grouping of contacts" and "interest analy-

---

**3.** On the subject of limitation of actions for federal securities fraud, a great deal of water

has subsequently gone over the dam. *See Henley v. Sloan*, 961 F.2d 23 (2d Cir.1992).

sis." 65 N.Y.2d at 196, 491 N.Y.S.2d at 94, 480 N.E.2d 679. *Schultz* goes on to observe that the *Babcock* analysis has been modified in certain respects by subsequent New York decisions, decisions which "establish that the relative interests of the domicile and locus jurisdictions in having their laws apply will depend on the particular tort issue in conflict in the case." 65 N.Y.2d at 197–98, 491 N.Y.S.2d at 95, 480 N.E.2d 679. The *Schultz* court then used language which I find particularly instructive in the case at bar:

> Thus, when the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort "will usually have a predominant, if not exclusive, concern" (*Babcock v. Jackson, supra,* 12 N.Y.2d at p. 483, 240 N.Y.S.2d 743, 191 N.E.2d 279; *see,* Restatement [Second] of Conflicts of Law § 145 comment d, at 417–418) because the locus jurisdiction's interest in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction ...

65 N.Y.2d at 198, 491 N.Y.S.2d at 95–96, 480 N.E.2d 679.

*Schultz* contrasts such a situation with one "when the jurisdictions' conflict rules relate to allocating losses that result from admittedly tortious conduct," 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d 679.

Plaintiffs at bar allege the torts of fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and breach of fiduciary duty. In short, plaintiffs challenge the integrity of defendants' conduct. That conduct took place in Israel. Whether or not defendants' conduct was tortious will be measured by the law of Israel. It is that law upon which the parties, plaintiffs and defendants alike, relied in respect of defendants' conduct; and the interest of Israel in applying its law to admonish or prevent similar conduct in the future assumes a critical and, in my opin-

ion, controlling importance in choice of law analysis.

Consistent with that analysis, this Court has regarded the place where the victim of fraud or negligence suffered economic loss as less significant for choice of law purposes than the law of the place by which the defendant's conduct is evaluated. *See, e.g., Guildhall Insurance Co., Ltd. v. Silberman,* 688 F.Supp. 910, 913 (S.D.N.Y. 1988) (Edelstein, J.) (diversity action for fraudulent and negligent misrepresentation involving insurance policy issued in New York; "even if Guildhall's alleged injury took place in New Jersey this contact is not a sufficient reason to apply to New Jersey law in this action."); *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse,* 652 F.Supp. 1289, 1299 (S.D.N.Y. 1987) (Lasker, J.) (in fraud action, split domiciles of New York and Switzerland not controlling where "[a]s to the issues of agency and bank secrecy, ... both clearly rooted in Switzerland and involving exclusively Swiss citizens, there is a much greater likelihood that Swiss law will provide the rule of decision.")

In the case at bar whether or not fraud or negligence was committed, or fiduciary or other duties were violated, involves exclusively Israeli citizens who acted (or failed to act) on Israeli soil. Applying New York choice of law principles, I conclude without difficulty that the law of Israel controls the case at bar.

*Complexity of the Case*

At oral argument counsel for plaintiffs characterized the case as "really quite a simple fraud case" which "will turn on issues of credibility" as between Sussman, Guilden *fils,* other unspecified witnesses in the United States "who assisted" Guilden *pere,* and "those witnesses whom the defense chooses to call." Tr. 32.

I do not think this a realistic appraisal. Plaintiffs' complaint alleges complicated and interrelated acts of fraud and misconduct by numerous Israeli individuals from 1979 through 1985. Fraud is not alleged with the specificity required by Rule 9(b), and if it were not for the forum non conveniens ground I would dismiss the complaint

for that reason. But it is apparent that many individuals participated in the events of which plaintiffs complain. For that reason plaintiffs sensibly add five "John Doe" defendants to the six they name; and *quaere,* given the scope of the conspiracy alleged, whether that is sufficient. It is by no means clear that defendants could compel the attendance of all significant participants at a trial in New York. Furthermore, most of the relevant documents, which in the nature of the case must be voluminous, are in Hebrew and accordingly would have to be translated for litigation here.

These are factors which must be considered in forum non conveniens analysis. Judge Weinfeld's opinion in *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 511 (S.D.N.Y.1982), granting a forum non conveniens motion for dismissal, is worth quoting at some length:

> A significant fact which emphasizes that Switzerland, particularly the Canton of Geneva, is the central location of all material witnesses and documents is the claim by Fustok that his accountants and other representatives unearthed the alleged fraudulent scheme after examining the Geneva records and documents of Banque and Advicorp. The simple fact that will not down is that if, as plaintiff alleges, a fraud was perpetrated by switching transactions to the detriment of plaintiff and to the benefit of the defendants, the actors who perpetrated the fraud did so in Geneva. When fraud charges are made, it is desirable that the factfinder have the benefit of demeanor testimony of witnesses who would be available in Geneva and not in the United States.
>
> Apart from the availability of material witnesses in Geneva, the pertinent documentary evidence is also located there. All bookkeeping records of Banque involving the silver transactions are in Geneva or elsewhere in Switzerland. So, too, are the Advicorp accounting documents regarding the transactions, minutes of Advicorp meetings, and correspondence between Advicorp and Banque. Many of the relevant documents

are in French, Italian or German and would have to be translated.

(footnotes omitted).

Comparable factors in the case at bar militate in favor of trial of plaintiffs' claims in Israel.

*Whether the Israeli Court Would Be a Fair Forum*

■ Forum non conveniens analysis is not meaningful unless there exists an alternative forum. Ordinarily that requirement is satisfied if the defendant is "amiable to process" in the other jurisdiction. *Gilbert,* 330 U.S. at 506–07, 67 S.Ct. at 842. However, *Piper Aircraft* recognized that in "rare circumstances," where "the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied." 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22. *Piper Aircraft* gave as an example a case "where the alternative forum does not permit litigation of the subject matter of the dispute," as in *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 78 F.R.D. 445 (Del.1978), in which the district court refused to dismiss "where alternative forum is Ecuador, it is unclear whether Ecuadorian tribunal will hear the case, and there is no generally codified Ecuadorian legal remedy for the unjust enrichment and tort claims asserted." *Id.*

■ Absent such a fundamental obstacle to a plaintiff's recovery (which is not suggested at bar), American courts are not prone to characterizing a sovereign nation's courts as "clearly unsatisfactory." International comity plays a part in this context as well. Procedural differences do not rise to that level. "[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Shields v. Mi Ryung Constr. Co.,* 508 F.Supp. 891, 895 (S.D.N.Y.1981). In *Shields* Judge Cannella entered a conditional order of forum non conveniens dismissal requiring an Arizona resident to peruse his claim against a South Korean corporation

in the courts of Saudi Arabia. Nor is a foreign tribunal eliminated as an alternative forum because its filing fees require an American plaintiff to reduce its claim for damages. *Diatronics v. Elbit Computers, Ltd.*, 649 F.Supp. 122, 127–28 (S.D.N.Y.1986), *aff'd*, 812 F.2d 712 (2d Cir. 1987) (Delaware corporation required by forum non conveniens dismissal to litigate claim in Israel).

■ In the case at bar, it cannot be gainsaid that plaintiffs make serious charges, involving a great deal of money, against high officials of the Israeli government. Plaintiffs say that these circumstances will prevent them from obtaining a fair hearing in the Israeli courts, so that Israel cannot be regarded as an alternative forum for forum non conveniens purposes.

Plaintiffs' initial condemnation of the Israeli court system was uncompromising. They said in their Main Brief at 22:

> In short, Israel does not provide an "adequate" alternative forum because, in light of the controversial nature of the plaintiffs' allegations, the Israeli courts will not give them a fair hearing. The Israeli courts are subject to the influence of the government officials and agencies whom the plaintiffs are suing and are unlikely to credit the plaintiffs' allegations of official involvement in *visut* and acquiescence, for purposes of a "cover-up," in bank mismanagement in succeeding years. The *only* judicial forum where this conspiracy of silence can effectively be broken is a federal court in the United States.

Plaintiffs submitted no affidavits from individuals familiar with Israeli courts, or any other evidentiary material, to support that mass indictment of a democratic nation's judicial system. Defendants' reply papers include affidavits from two Israeli law professors stressing the independence of Israeli judges, who are tenured until the reach they age of 70. Indeed, readers of newspapers are aware of the fact that Israeli courts are entirely capable of making judgments displeasing to those in high civil or military authority.

Plaintiff, in a surreply submission permitted by this Court, offered an affidavit by Kenneth Mann, an Israeli law professor and attorney. The Mann affidavit is more moderate, at least in tone. He argues that the report of the Beisky Commission, established by the Israeli Parliament to investigate the bank shares crisis, and two decisions of the Israeli Supreme Court articulate a "passive bystander thesis" in respect of the BOI and other government officials: a thesis which, in Professor Mann's words, "holds that the commercial banks got away with a scheme of their own doing under the careless eye of the BOI and other government officials, while specifically rejecting the idea that the BOI conspired with the banks to establish and facilitate the *visut*." Affidavit at ¶ 6. Those circumstances, Professor Mann argues, have created a "negative predisposition" against claims that government officials actively participated in misconduct, a phenomenon which "critically weakens the judicial neutrality necessary to a full and balanced consideration in an Israeli court of the ... issues so central to the plaintiff's New York suit." *Id.* at ¶ 22. Professor Mann concludes his affidavit by saying:

> While I cannot say with certainty that any particular lower court in Israel will be adversely influenced by what has already happened, it is abundantly clear that, as a matter of institutional due process in civil litigation, the plaintiffs' reasons for seeking an alternative forum are well justified.

*Id.* at ¶ 37.

Any moderation in the plaintiffs' criticism of the Israeli judicial system is more apparent than real. The concept of a "negative predisposition" (unknown in any forum non conveniens jurisprudence) is made up of subjective and objective elements. "Negative" is the subjective element; it reflects plaintiffs' concern that the perceived predisposition disfavors their cause. Presumably defendants, if they acknowledged the existence of a judicial predisposition, would regard it as a "positive" one. But the key word is "predisposition." Plaintiffs say that the circumstances of the case give rise to the existence of a predis-

position against them on the part of the Israeli courts.

That is as serious a charge as can be made against a judge. Judges swear an oath to decide cases on the facts and on the controlling law, without fear of or favor to any party, individual or government. Predisposition is "the state of being predisposed," in turn defined as to "make someone inclined to something in advance," *The American Heritage Dictionary of the English Language* (ed. 1976); perhaps in this case, a judicial inclination to reject plaintiffs' claims in advance of hearing and seeing the evidence.

I am not prepared to indulge the assumption that Israeli judges, if presented with plaintiffs' claims, would be so affected by a "negative predisposition" that they would fail faithfully to discharge the solemn duty that lies at the heart of the judicial office. I do not find it necessary to consider the detailed arguments of counsel with respect to the real meaning of the Beisky Commission report, or whether the two Israeli Supreme Court cases cited by Professor Mann bear directly or indirectly, or to what extent, upon plaintiff's particular claims.[4] I prefer to rest my decision on the ground that plaintiffs' preference for an American court cannot be indulged on the basis of an American judge's speculation that his Israeli colleagues would violate their oaths of office.

The proper inquiry goes to the court system, and not to the particular personalities or claims involved. Chief Judge Weinstein made that point in *Murty v. Aga Khan,* 92 F.R.D. 478 (E.D.N.Y.1981), in which an American citizen resident in New York sued that formidable and wealthy spiritual and political leader and French citizen the Aga Khan. Judge Weinstein granted a motion to dismiss on forum non conveniens grounds and relegated the plaintiff to the courts of France. In doing so, Judge Weinstein rejected plaintiff's suggestion that he could not get a fair hearing suing the Aga Khan in that coun-

try. Relying in part upon that concept of comity which informs my conclusions in the case at bar, Judge Weinstein said at 92 F.R.D. at 482:

> Plaintiff's complaints about the influence which defendant can and will bring to bear on the French judicial system— though fervently presented—are not supported. He alleges neither that the French judiciary is inadequately protected from interference nor that it lacks appropriate procedural safeguards. The adequacy of a foreign forum for purposes of transfer of venue turns not on the status any individual litigant may hold in a foreign society, but on the soundness and procedural fairness of that society's court system.
>
> Principles of comity as well as common knowledge preclude our characterizing the French judicial system as any less fair than our own; the French courts can be expected to protect American litigants.

In the case at bar, plaintiffs' expert Professor Mann is careful to refrain from saying that "any particular lower court in Israel will be adversely influenced" by the circumstances described in his affidavit. Stripped of rhetoric, all his affidavit really says is that he understands why plaintiffs would rather sue on their claims in the United States than in Israel. That is not a sufficient basis for regarding Israel as an inadequate forum. And it will be a black day for comity among sovereign nations when a court of one country, because of a perceived "negative predisposition," declares the incompetence or worse of another nation's judicial system.

Accordingly I conclude that the particular factors relied upon by the plaintiffs do not overcome the manifest truth that trial of plaintiffs' claims in Israel will be most convenient and will better serve the ends of justice.

Many of the reasons why that is so appear in the preceding discussion. To recapitulate, the Israeli courts constitute an ade-

---

**4.** I do note in passing that plaintiffs do not contend they would be confronted by an Israeli

equivalent of res judicata or collateral estoppel.

quate alternative forum for plaintiffs' claims. I reject plaintiffs' contention that they cannot get a fair hearing in the courts of Israel, or that the remedy offered by that forum is clearly unsatisfactory for any reason. Israeli law governs the propriety of defendants' conduct. The vast majority of the witnesses reside in Israel. Plaintiffs have not shown that any witnesses with probative evidence to give reside in New York. Sussman resides in California. Ira Guilden is dead. It is not clear from plaintiffs' vague representations what admissible evidence Paul Guilden or others who knew Ira Guilden would be competent to give. While two Bank of Hapoalim employees are identified as having participated in the transfer of the loan proceeds through the New York branch, the motion papers reveal that one of these has retired to Israel and the other is dead. The great majority of the pertinent documents are in Hebrew. Israel's public interest in the issues raised by these charges dwarfs the public interest of New York, which is minimal. All in all, this is a quintessential case for application of the forum non conveniens doctrine.

Accordingly, and in the exercise of my discretion, I grant defendants' motion and conditionally dismiss the complaint, without prejudice to the merits of plaintiff's claims, on the ground of forum non conveniens. I reach no other issue.

Dismissal is on the following conditions:

(1) That defendants waive any statute of limitations defense under Israeli law that may have arisen since the commencement of the captioned action in this Court; and

(2) That plaintiff Sussman receive written assurances from the appropriate Israeli authorities that he will not be detained in Israel by reason of his traveling to that country to defend against the claims pending against him relating to this matter or to assert the claims embraced in the complaint. I make that condition in order to address a concern expressed on behalf of Sussman on this motion. I direct that an agreement signifying the agreement of the defendants and the Government of Israel to these conditions be filed with this Court

within sixty (60) days of the date of this Opinion. Upon the filing of that agreement, the conditional order of dismissal will be made absolute. Discovery is stayed in the interim.

It is SO ORDERED.