68

Erwin SUSSMAN and Ira Guilden deceased, By and Through Paul Guilden, his personal representative, Plaintiffs,

v.

BANK OF ISRAEL, Ministry of Finance of the Government of Israel, Bank of Hapoalim, Ltd., Moses Mandelbaum Galia Maor, Zeev Eveles, and John Does 1–5, Defendants.

No. 91 Civ. 4091 (CSH).

United States District Court, S.D. New York.

March 29, 1994.

Miller, Cassidy, Larocca & Lewin, Washington, DC (Nathan Lewin, Seth P. Waxman, and Michael J. Barta, of counsel), and Schlam, Stone & Dolan, New York City (Richard H. Dolan, of counsel), for plaintiff Erwin Sussman and plaintiffs' counsel.

Lawrence Iason, Catherine M. Foti, and Christopher Gunther, Morvillo, Abramowitz, Grand, Iason & Silverberg, P.C., New York City, for plaintiff Ira Guilden, deceased, by and through and Paul Guilden, his personal representative.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants (Jonathan J. Lerner and Angela G. Garcia, of counsel).

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Having succeeded in their motion to dismiss the complaint on the basis of forum non conveniens, defendants now move for sanctions against plaintiffs and their counsel under Rule 11, Fed.R.Civ.P., 28 U.S.C. § 1927, and the Court's inherent power. The circumstances of the case are described in this Court's opinion dismissing the complaint, 801 F.Supp. 1068 (S.D.N.Y.1992), and the *per curiam* affirmance by the Court of Appeals, 990 F.2d 71 (2d Cir.1993). Familiarity with those opinions is assumed.

This is an appropriate case for sanctions under Rule 11, as well as the Court's inherent power to deal with abusive litigation. I base that conclusion upon the manifestly improper purpose which played a significant part in plaintiffs' motivation for filing their complaint.

The 1983 Israeli "Bank Share Crisis" resulted, among other consequences, in the initiation on May 1, 1989 of civil proceedings by North American Bank's Israeli liquidator, an Israeli Government officer, against the bank's foreign shareholders, including Sussman and Guilden. 801 F.Supp. at 1071. The liquidator brought that action in the Jerusalem District Court. It made Sussman and Guilden very unhappy. They wanted the Jerusalem civil action against them to go away. But it did not. By the end of May 1991 the Jerusalem civil action was nearing trial.

Sussman and Guilden consulted the Washington, D.C. law firm of Miller, Cassidy, Larroca and Lewin. Nathan Lewin, Esq., was their principal legal adviser. Mr. Lewin and his firm prepared the complaint in the action at bar. Before filing the complaint in this Court, Mr. Lewin sent identical letters to a number of highly placed Israeli Government officials. His letter dated May 30, 1991 to the Minister of Finance is one of them. It is attached as an appendix to this opinion.

Each letter began with these three paragraphs:

> We represent Erwin Sussman and Paul Guilden, who is the executor of the estate of the late Ira Guilden. This letter is being written to advise you of our intention promptly to file a lawsuit in federal court in the United States against certain agencies of the Government of Israel that have committed fraud against our clients and are currently engaged in a continuing improper effort to harass and extort funds from them.

> This is a matter of extreme urgency because, in the absence of any satisfactory resolution of our differences, the lawsuit will be filed in New York within the next ten days. The agencies of the Government of Israel that are engaged in an effort directed against our clients are also pressing a trial in the Jerusalem District Court that is scheduled to begin shortly.

> If this controversy erupts into public view with the filing of our lawsuit and the inception of the Israeli proceeding, it will not only result in a grave injustice to individuals who have been among Israel's most constant and generous supporters, but will seriously damage foreign investment in Israel in the future. The dispute concerns North American Bank, which was liquidated after its Israeli managers engaged in criminal acts that resulted in the loss of millions of dollars.

Mr. Lewin then recited the grievances of Sussman and Guilden at being sued in the Jerusalem civil action. Each letter concluded with these two paragraphs:

> Our clients have heretofore been reluctant to take the step of filing suit because a full airing of this outrageous conduct by the Government of Israel will surely deter many potential foreign investors who might otherwise be interested in lending financial resources to Israel. However, the enormity of this injustice and the relentless prosecution of the case in Jerusalem leaves them no option.

> If you believe that discussions on this subject can lead to a fruitful and mutually satisfactory resolution, I am prepared to come to Jerusalem promptly to meet with you.

The message sought to be conveyed by these letters is crystal clear: drop the Jerusalem action against Sussman and Guilden, or they will sue the Israeli Government for fraud in New York, and the attendant publicity will cause economic damage to Israel. That constitutes abuse of the litigation process. I am not persuaded by the quite different interpretations plaintiffs and their counsel seek to place upon counsel's words. Letters, of course, are not pleadings. They do not themselves fall within Rule 11. But these letters furnish powerful evidence of the improper purpose for which this complaint was filed.

One of the recipients of a "Lewin Letter" was the Governor of the Bank of Israel, a defendant in the contemplated action here.

An Israeli attorney representing the Bank, I. Amihud Ben–Porath, was in New York when the Governor received Mr. Lewin's letter in Israel. The letter was faxed to Mr. Ben–Porath on June 2, 1991. He telephoned Mr. Lewin. Mr. Lewin sent Mr. Ben–Porath a copy of the draft complaint at the latter's New York Hotel, together with a forwarding letter whose first paragraph read:

> Enclosed is the latest draft of the complaint we intend to file in United States District Court. I have not, in our conversation, overstated my clients' anger at how shabbily they have been treated in Israel, and I hope you appreciate it and are able to communicate this feeling.

Mr. Lewin closed with the sentiment that "[m]aybe we can save both our clients much travail."

Lewin, Sussman, and Guilden met with Ben–Porath at the latter's hotel on June 4. Sussman and Guilden expressed their anger at the Jerusalem suit. Ben–Porath replied that the threatened New York action against the Israeli Government would be regarded as blackmail and thus counter-productive. Ben–Porath Declaration at ¶ 5. Mr. Ben–Porath returned to Israel on June 7 and briefed the Legal Adviser to the Bank of Israel. During the following week, Mr. Ben–Porath had several telephone conversations with Mr. Lewin. Mr. Lewin "insisted that the hearing in Jerusalem be suspended as a condition of not filing the threatened action in New York." *Id.* at ¶ 7. The Jerusalem action was not suspended. In a telephone conversation on June 16, Mr. Lewin told Mr. Porath that the New York action was being filed. *Id.* at ¶ 8.

Mr. Lewin's letters to Israeli Government officers contained the prediction (to state it charitably) that commencement of the New York litigation would result in publicity adverse to Israel. That prediction came to pass with Mr. Lewin as a participant. Newspaper articles describing the suit appeared in Israel and the United States. The June 18, 1991 edition of The Jerusalem Post quoted Mr. Lewin as saying that "the case was being pursued in the U.S. despite the fact the matter has been addressed by the Israeli courts, since the bank's foreign investors 'were very badly treated by the Israeli court system.'" The October 31, 1991 edition of The New York Times attributed to plaintiffs the assertion that the Jerusalem civil action against them "is a betrayal of their willingness to respond to [Israel's] pleas for financial support." Mr. Lewin is then quoted as saying: "The message is that if you lend your name to anything in Israel, you can no longer be sure that some lawyer and court won't come after you with huge liabilities." In considering these statements in the press, I do no violence to Mr. Lewin's First Amendment rights. But they are probative of the improper purpose for which the complaint was filed.

The several defendants moved to dismiss the complaint on the ground of forum non conveniens, arguing that Israel was the proper forum. They also moved to dismiss on various substantive grounds. I granted the forum non conveniens motion and accordingly did not reach the merits. 801 F.Supp. at 1071.

Rule 11, in the form in existence at the pertinent times, mandates a sanction when a pleading has been "interposed for any improper purpose ..."[1] A trial court also has the "inherent power ... to assess costs and attorney's fees against either a client or his attorney where a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *United States v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir.1991), citing and quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). I hold that the filing of a complaint in a highly

---

1. The 1993 amendments to Rule 11 make the imposition of sanctions discretionary rather than mandatory. I may give the amendments retroactive effect for the purpose of exercising that discretion. *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir.1994). Further retroactive effort would not be allowed if it charged the standards of sanctionable conduct. *Id.* at 78. That question does not arise in the case at bar because both versions of Rule 11 condemns filings for an "improper purpose." In the view I take of the case, I would impose sanctions in the exercise of my discretion, even if they were not mandated.

doubtful venue, for the express purpose of putting pressure on a foreign government to drop or compromise that government's action against the plaintiffs in the foreign nation's courts, furnishes a stark example of improper and oppressive litigation. That proposition seems to me self-evident. I see no need to discuss the many cases cited in the voluminous briefs on this motion. The issue is intensely fact-oriented.

Plaintiffs protest that their purpose in filing the complaint was to secure an American forum for their fraud claims against defendants. They say the purity and fixity of their purpose should be inferred from the vigor with which they litigated their right to do so in this Court and the Court of Appeals. I accept that plaintiffs were also motivated by their forum preference, and that they did not go gently from it. It is commonplace, however, that the law recognizes multiple motives in human behavior. In this case plaintiffs had two motives. One was to pressure the Israeli Government to cease prosecution of the Jerusalem action against them by threatening to file, and eventually filing, a sensational complaint against the Government in New York. The other motive was to obtain American jurisdiction if the threats failed, as in fact they did. The conduct inspired by the first motive was improper.

Accordingly the filing of the complaint at bar is sanctionable under Rule 11 and this Court's inherent power.[2] While some sanction under Rule 11 is mandated, the district courts have discretion to decide who should pay it (client or attorney), as well as the amount and the form.

■ I decline to sanction the plaintiffs in this case. Where to file an action is essentially a legal decision. Plaintiffs commenced an action in this Court on counsel's advice.

Counsel sent the pre-filing letters to the Israeli officials. Counsel orchestrated the meeting with Mr. Ben–Porath, prefacing it by sending him a draft of the complaint. Plaintiffs did not sign the pleading. They did not sign the letters. Prior to the Supreme Court's decision in *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991), the rule in the Second Circuit was "that a represented party was subject to Rule 11 sanctions only upon a showing of subjective bad faith." *Teamsters* at 948 F.2d 1344 n. 3. Defendants have not made that showing with respect to Sussman or Guilden. They could share counsel's strategic objective without perceiving that the strategy was improper, as counsel were bound to do with the benefit of professional standards. *Business Guides* changed the Second Circuit rule with respect to parties who sign pleadings or other Rule 11 papers, but left open whether a subjective or objective standard applies to non-signing parties. In the present state of the law, I do not think this is an appropriate case for sanctioning the parties, either under Rule 11 or the Court's inherent power.

The sanction will accordingly fall upon Mr. Lewin, who signed the complaint and devised the strategy. His firm is not subject to a Rule 11 sanction, *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), and I decline to sanction the firm under my inherent power.

■ Richard H. Dolan, Esq., of the New York firm of Schlam, Stone & Dolan, also signed the complaint. But the record makes it clear that this firm acted only as plaintiffs'

---

**2.** Defendants also request sanctions under 28 U.S.C. § 1927. I do not think that section is applicable to this case. It authorizes sanctions against one who "multiplies the proceedings in any case unreasonably and vexatiously ..." Defendants at bar say that the complaint is sanctionable. A complaint initiates a proceeding; it does not "multiply" an existing one. There is a split in the circuits as to whether an initial pleading falls within § 1927. *See* Joseph, *Sanctions: The Federal Law of Litigation Abuse* (2d ed. 1994) at 383–86. I prefer the stricter construction

because "a broader construction can take unnecessary liberties with the statutory language." *Id.* at 387. Joseph suggests that the filing by a plaintiff of a repetitious complaint asserting in a different forum the same claim previously filed in another forum "may be deemed to multiply the proceedings of the original case" so as to fall within § 1927, and "there is no logical reason why the sanction could not be applied by the second court." *Id.* at 385. That rationale does not apply to the instant case, since Sussman and Guilden were defendants in Israel, not plaintiffs.

local counsel and did not participate in the strategy. I will not sanction Mr. Dolan.

■ I regard the matter as serious. Mr. Lewin is sanctioned in the amount of $50,000, to be paid to counsel for defendants for distribution to defendants in whatever manner they may decide. This amount covers all claims that defendants have asserted in the case. My purpose is to deter, not to fully compensate.[3]

It is SO ORDERED.

## APPENDIX

## LAW OFFICES

MILLER, CASSIDY, LARROCA & LEWIN

2555 M STREET, N.W.

WASHINGTON, D.C. 20037

TELEPHONE

(202) 293–6400

TELECOPIER

(202) 293–1827

May 30, 1991

VIA TELECOPIER

The Honorable Yitzchak Moda'i

Minister of Finance

Office of the Minister of Finance

Israeli Ministry of Finance

Kaplan Street, Building No. 1 (HaKirya)

Jerusalem

Israel

Dear Mr. Moda'i:

We represent Erwin Sussman and Paul Guilden, who is the executor of the estate of the late Ira Guilden. This letter is being written to advise you of our intention promptly to file a lawsuit in federal court in the United States against certain agencies of the Government of Israel that have committed fraud against our clients and are currently engaged in a continuing improper effort to harass and extort funds from them.

This is a matter of extreme urgency because, in the absence of any satisfactory resolution of our differences, the lawsuit will be filed in New York within the next ten days. The agencies of the Government of Israel that are engaged in an effort directed against our clients are also pressing a trial in the Jerusalem District Court that is scheduled to begin shortly.

If this controversy erupts into public view with the filing of our lawsuit and the inception of the Israeli proceeding, it will not only result in a grave injustice to individuals who have been among Israel's most constant and generous supporters, but will seriously damage foreign investment in Israel in the future. The dispute concerns North American Bank, which was liquidated after its Israeli managers engaged in criminal acts that resulted in the loss of millions of dollars.

Neither Mr. Guilden nor Mr. Sussman, nor any other foreign investor or director was involved in any manner, shape or form in these criminal acts. The foreign investors were, at most, honorary directors of the bank, and it was well known that they were not in a position to engage in active supervision of its activities. Indeed, the foreign investors relied on the Bank of Israel and its inspectors to supervise North American Bank and to insure that its business was run properly.

After North American Bank failed and the foreign investors lost millions of dollars, the Bank of Israel induced the Official Receiver, who is the liquidator of the bank, to initiate a lawsuit against Messrs. Sussman, Guilden, and other foreign investors charging them with negligent direction of the activities of North American Bank. Presentation of evidence in that case in Jerusalem is scheduled to begin on June 9.

---

**3.** Thus there will be no separate sanction arising out of plaintiffs' motion to amend the Court's July 17, 1992 opinion and order. I also stress that sanctions are based solely on the improper purpose for filing the complaint. Defendants also claim that a number of sanctionable statements were made in subsequent filings. They all relate to the merits of the underlying claims. I did not reach the merits in dismissing the complaint on forum non conveniens, and decline to expend more judicial resources in exploring them now.

If the Receiver were acting in the best interests of North American Bank, he would have brought an action against the Bank of Israel for its dereliction of duty. Indeed, as we recently discovered in reviewing the evidence in the criminal case of Mr. Halperin, the Bank of Israel and its high-ranking officers were parties to a secret arrangement, made by the Ministry of Finance in October 1983, to enable the Israeli management of North American Bank to obtain ten million dollars from a bank in New York City to continue their practice of "visut" and to embezzle additional funds. This heretofore secret transaction will be the focus of the case to be brought in New York.

The case now pending in Jerusalem is the culmination of years in which improprieties at North American Bank were overlooked or deliberately ignored by the Bank of Israel. It is grossly unjust for the Bank of Israel now to shift the blame for its own conduct to individuals who have always supported Israel emotionally and financially and seek to hold these foreign supporters liable, in an amount exceeding 200 million *shekalim*, for the losses caused by the failure of North American.

In addition to the loss of their investments, which amounted to millions of dollars, our clients estimate that they have been forced to spend in excess of one million dollars fighting baseless claims made in the Israeli courts. Our lawsuit in federal court in New York will seek recovery against the Ministry of Finance, the Bank of Israel and individual government officials for these losses and for other harm caused to our clients.

Our clients have heretofore been reluctant to take the step of filing suit because a full airing of this outrageous conduct by the Government of Israel will surely deter many potential foreign investors who might otherwise be interested in lending financial resources to Israel. However, the enormity of this injustice and the relentless prosecution of the case in Jerusalem leaves them no option.

If you believe that discussions on this subject can lead to a fruitful and mutually satisfactory resolution, I am prepared to come to Jerusalem promptly to meet with you.

Sincerely yours,

/s/  Nathan Lewin

Nathan Lewin