Erwin SUSSMAN, and Ira Guilden, deceased, by & through Paul Guilden, his personal representative, Plaintiffs,

Nathan Lewin, Esq., Appellant–Cross–Appellee,

v.

BANK OF ISRAEL, Ministry of Finance of the Government of Israel, Bank Hapoalim Ltd., Moses Mandelbaum, Galia Maor, Zeev Eveles, and John Does, 1–5, Defendants–Appellees–Cross–Appellants.

Nos. 1034, 1035, Dockets 94–7437, 94–7481.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1995.

Decided June 2, 1995.

Kenneth W. Starr, Washington, DC (Alex M. Azar II, Christopher Landau, Kirkland &

Ellis, Washington, DC; Herbert J. Miller, Jr., Miller, Cassidy, Larroca & Lewin, Washington, DC, on the brief), for appellant-cross-appellee.

Jonathan J. Lerner, New York City (Angela G. Garcia, Skadden, Arps, Slate, Meagher & Flom, New York City, on the brief), for defendants-appellees-cross-appellants.

Before: OAKES, KEARSE, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Nathan Lewin, Esq., an attorney for the plaintiffs herein whose complaint was dismissed on the ground of forum non conveniens, appeals from so much of a judgment of the United States District Court for the Southern District of New York, Charles S. Haight, Jr., *Judge*, as imposed a $50,000 sanction against Lewin pursuant to Fed. R.Civ.P. 11 and the court's inherent power on the ground that the complaint, signed by Lewin, had been filed in part for an improper purpose. The court held that, although plaintiffs were also motivated in part by a proper purpose, the presence of an improper purpose warranted the imposition of sanctions. On appeal, Lewin contends principally (1) that the criticized purpose was not improper, and (2) that sanctions could not properly be imposed because the claims asserted in the complaint were not frivolous. Defendants cross-appeal, contending that the sanctions should have been more severe. For the reasons that follow, we agree with Lewin that the award of sanctions was an abuse of discretion. We therefore reverse the judgment and dismiss the cross-appeal.

## I. BACKGROUND

For the purposes of this appeal, the events are not in dispute. The plaintiffs are Erwin Sussman and the estate of Ira Guilden (Guilden and/or the estate referred to as "Guilden"), who died in 1984. Sussman, a Swedish citizen who lives in the United States, and Guilden, a United States citizen who resided in New York, were founders, directors, and shareholders of North American Bank Ltd. ("NAB"), an Israeli bank. Defendants are

the Bank of Israel ("BOI"), which insured deposits in Israeli banks, and several other Israeli entities and individuals.

## A. The Collapse of NAB and the Litigation in Israel

In 1985, NAB collapsed after years of fraud, embezzlement, and mismanagement by its senior managers in Israel. BOI made payments to NAB depositors and obtained the appointment of the Official Receiver of the State of Israel (the "Receiver") to liquidate NAB's remaining assets. In 1989, the Receiver commenced a civil action in Israel in the name of the State of Israel (the "Israeli action"), naming as defendants Sussman, Guilden, and several other officers and directors of NAB, and alleging, *inter alia*, that the NAB directors had been negligent and had breached their fiduciary duties by failing to monitor adequately the management of NAB and to ensure that NAB operated in compliance with Israeli banking regulations. The Receiver's complaint sought recovery from the defendants, jointly and severally, of more than $100 million dollars to compensate for losses allegedly incurred by BOI as a result of NAB's collapse.

Sussman and Guilden, represented by Israeli counsel, raised affirmative defenses to the Receiver's claims and asserted third-party claims against BOI and two of its officials. In addition to alleging that BOI and the officials had been negligent in failing to carry out their supervisory duties with respect to NAB, the third-party claims alleged that BOI and the officials had deliberately misrepresented NAB's financial condition and concealed from NAB's non-Israeli directors certain financial transactions stemming from a 1983 banking scandal in Israel, which came to be known as the "Bank Shares Crisis" following revelations that many Israeli banks were artificially and unlawfully inflating the market prices of their respective shares. The third-party claims alleged that BOI and the Israeli Ministry of Finance (the "Ministry") had sought to avert the financial collapse of NAB by extending it a secret $10 million loan in order to allow NAB's senior managers to continue their manipulation of NAB's stock price; that the third-party-defendant officials, despite learning of the NAB managers' improper activities, had continued to misrepresent NAB's situation to its non-resident directors and sought to prevent public disclosure of BOI's role in the NAB stock-manipulation scheme; and that NAB would not have collapsed but for the actions of BOI and the defendant officials. Sussman and Guilden sought contribution and indemnification for any amounts that they might be required to pay in the Israeli action.

## B. The Preparation and Filing of the New York Complaint

Thereafter, Sussman and Guilden retained Lewin, a partner in the Washington, D.C. law firm of Miller, Cassidy, Larroca & Lewin, to investigate the circumstances underlying the Israeli suit and to evaluate the prospects for further litigation against BOI and other Israeli officials involved in the events at NAB. In 1991, as the Israeli action was nearing its scheduled trial date, Lewin drafted a complaint to be filed in New York (the "New York complaint"), naming as defendants BOI; the Ministry; three BOI officials, including the two named as third-party defendants in the Israeli action; and Bank Hapoalim, Ltd. ("Bank Hapoalim"), an Israeli bank with a branch office in New York.

The New York complaint substantially repeated Sussman and Guilden's assertions in the Israeli action that BOI and its officials had helped NAB managers to manipulate the price of NAB stock following the Bank Shares Crisis. It also alleged that the secrecy of the scheme was maintained by routing the Ministry's clandestine $10 million loan to NAB through Bank Hapoalim's New York office; that BOI and Ministry officials contemporaneously assured Sussman that NAB was well-managed and financially stable, thereby inducing him not to sell his NAB shares; that BOI knew that the directorships held by NAB's foreign investors were largely honorary and that the investors were relying on BOI to monitor NAB's Israeli operations; and that Sussman and Guilden had relied on the representations of BOI and the Ministry in not taking action to protect their investments. The complaint also alleged that the filing of the Israeli action was itself part of

BOI's continuing scheme to force Sussman and Guilden to bear the costs of BOI's failure to rectify the fraud and mismanagement at NAB. Sussman and Guilden sought, *inter alia*, damages totaling $17 million for the lost value of their investments in NAB.

Before filing the complaint, Lewin sent identical letters dated May 30, 1991 (the "May 1991 warning letter"), to several Israeli government officials, including then-Prime Minister Yitzchak Shamir, then-Minister of Finance Yitzchak Moda'i, and BOI Governor Michael Bruno, warning them of Sussman and Guilden's intention to bring the present suit, and proposing settlement discussions. After describing the general nature of the charges contained in the draft complaint, the letter stated:

> This is a matter of extreme urgency because, in the absence of any satisfactory resolution of our differences, the lawsuit will be filed in New York within the next ten days. The agencies of the Government of Israel that are engaged in an effort directed against our clients are also pressing a trial in the Jerusalem District Court that is scheduled to begin shortly.
>
> If this controversy erupts into public view with the filing of our lawsuit and the inception of the Israeli proceeding, it will not only result in a grave injustice to individuals who have been among Israel's most constant and generous supporters, but will seriously damage foreign investment in Israel in the future.

(May 1991 warning letter at 1.) The letter further asserted that Sussman and Guilden "were, at most, honorary directors of [NAB]" (*id.*), and that they had had no involvement in the improper activities of NAB's managers and had "relied on [BOI] and its inspectors to supervise [NAB] and to insure that its business was run properly" (*id.* at 2). It then concluded:

> The case now pending in Jerusalem is the culmination of years in which improprieties at North American Bank were overlooked or deliberately ignored by the Bank of Israel. It is grossly unjust for the Bank of Israel now to shift the blame for its own conduct to individuals who have always supported Israel emotionally and

financially and seek to hold these foreign supporters liable, in an amount exceeding 200 million *shekalim*, for the losses caused by the failure of [NAB].

> In addition to the loss of their investments, which amounted to millions of dollars, our clients estimate that they have been forced to spend in excess of one million dollars fighting baseless claims made in the Israeli courts. Our lawsuit in federal court in New York will seek recovery against the Ministry of Finance, the Bank of Israel and individual government officials for these losses and for other harm caused to our clients.

> Our clients have heretofore been reluctant to take the step of filing suit because a full airing of this outrageous conduct by the Government of Israel will surely deter many potential foreign investors who might otherwise be interested in lending financial resources to Israel. However, the enormity of this injustice and the relentless prosecution of the case in Jerusalem leaves them no option.

> If you believe that discussions on this subject can lead to a fruitful and mutually satisfactory resolution, I am prepared to come to Jerusalem promptly to meet with you.

(*Id.* at 2–3 (italics in original).)

In response to the letter, Amihud Ben-Porath, an Israeli attorney representing BOI, telephoned Lewin and requested a copy of the draft complaint. Lewin sent a copy with a June 3, 1991 covering letter (the "June 1991 letter") stating, "I have not, in our conversation, overstated my clients' anger at how shabbily they have been treated in Israel, and I hope you appreciate it and are able to communicate this feeling.... Maybe we can save both our clients much travail." Ben-Porath thereafter met with Lewin, Sussman, and Guilden in New York and talked with Lewin several times by telephone. After Ben-Porath advised Lewin that Israeli officials were unwilling to settle the dispute and withdraw the Israeli action, Lewin filed the New York complaint on June 17, 1991.

## C. The District Court Proceedings

### 1. The Dismissal of the New York Complaint

In lieu of an answer, BOI moved to dismiss the New York complaint on numerous substantive and procedural grounds, but principally argued the ground of forum non conveniens. In opposition to the forum non conveniens motion, plaintiffs argued, *inter alia,* that some evidence available to them in the New York action, including Sussman's own testimony, would be unavailable in Israel. They stated that Sussman could not travel to Israel to testify without the risk of being detained there by the Israeli government; Sussman stated in an affidavit that his prior requests of defendants and other Israeli government officials for a guarantee of safe passage into and out of Israel for that purpose had been denied.

In an opinion reported at 801 F.Supp. 1068 (S.D.N.Y.1992), *aff'd* 990 F.2d 71 (2d Cir. 1993) (per curiam), the district court dismissed on the forum non conveniens ground. While acknowledging that the forum preferences of Sussman, a United States resident, and Guilden, a deceased American citizen whose estate was being administered in New York, were entitled to some degree of deference, the court held that other factors pointed to Israel as the more appropriate forum. It noted principally that all of the claims in the New York complaint would be governed by Israeli law; that Sussman and Guilden had voluntarily elected to invest in Israel; and that parallel litigation arising out of the same alleged conduct was already proceeding there. The court rejected Sussman and Guilden's contention that their claims arose out of the alleged secret $10 million loan transmitted through Bank Hapoalim's branch in New York, concluding that the New York conduct "cannot be regarded, in the overall scheme of things, as other than peripheral" to alleged acts and omissions "occurring entirely in Israel." 801 F.Supp. at 1074. The court also rejected the contention that an Israeli court would be predisposed against Sussman and Guilden's claims. It concluded that, in light of the complexity of the case and the interests of international comity, the claims in the New York complaint presented "a quintessential case for application of the forum non conveniens doctrine." *Id.* at 1079. The court did not otherwise address the substance of Sussman and Guilden's allegations; rather, it conditionally dismissed the New York complaint "without prejudice to the merits of plaintiff[s'] claims." *Id.*

The court imposed two conditions on the grant of dismissal. First, it required defendants to waive any statute-of-limitations defense under Israeli law that might have become available after the commencement of the New York action. Second, the court required the Israeli government to provide Sussman with "written assurances" that he would not be detained in Israel should he travel there for the purpose of defending the Israeli action or of asserting claims covered by the New York complaint. *Id.* Defendants complied with the court's conditions, and the complaint was dismissed. An appeal by Sussman and Guilden from the dismissal was rejected in a per curiam opinion. *See* 990 F.2d 71.

### 2. The Rule 11 Motion and the Sanctions Award

Following this Court's affirmance of the forum non conveniens dismissal, BOI moved in the district court for an award of sanctions pursuant to Fed.R.Civ.P. 11, 18 U.S.C. § 1927 (1988), and the court's inherent power. They argued (a) that the New York lawsuit had been instituted for an "improper purpose," and (b) that the New York complaint and other papers filed by Sussman and Guilden "contained numerous arguments lacking factual and legal basis."

In an opinion reported at 154 F.R.D. 68 (S.D.N.Y.1994), the district court granted the motion to the extent of imposing sanctions of $50,000 against Lewin pursuant to Rule 11 and the court's "inherent power to deal with abusive litigation." 154 F.R.D. at 69. The court declined to rule on BOI's contention that the allegations of the complaint were unsubstantiated, noting that it "did not reach the merits in dismissing the complaint on forum non conveniens [grounds], and declin[ing] to expend more judicial resources in exploring them now." *Id.* at 72 n. 3. Rath-

er, it imposed its sanctions "based solely," *id.*, on what the court described as "the manifestly improper purpose which played a significant part in plaintiffs' motivation for filing their complaint," *id.* at 69.

In finding an improper purpose, the court quoted extensively from Lewin's May 1991 warning letter and his June 1991 letter to Ben–Porath and found that they were designed to force the withdrawal of the Israeli action by threatening the Israeli government with negative publicity that would result in "economic damage to Israel." *Id.* at 69. While acknowledging that Rule 11 sanctions may be imposed only for an abusive "pleading, motion, or other paper," *see* Fed.R.Civ.P. 11, and that prelitigation letters do not fall within the scope of the Rule, the court stated that Lewin's strategy constituted an "abuse of the litigation process," and that the letters provided "powerful evidence of the improper purpose for which th[e New York] complaint was filed." 154 F.R.D. at 69. In addition, the court found that Lewin's "prediction" of adverse publicity "came to pass with Mr. Lewin as a participant." *Id.* at 70. The court cited an article in the June 18, 1991 edition of the *Jerusalem Post,* quoting Lewin as saying that NAB's foreign investors " 'were very badly treated by the Israeli court system,' " *id.*, and an October 31, 1991 *New York Times* article quoting Lewin as saying, " 'The message is that if you lend your name to anything in Israel, you can no longer be sure that some lawyer and court won't come after you with huge liabilities.' " *Id.* The district court stated that

> the filing of a complaint in a highly doubtful venue, for the express purpose of putting pressure on a foreign government to drop or compromise that government's action against the plaintiffs in the foreign nation's courts, furnishes a stark example of improper and oppressive litigation. That proposition seems to me self-evident. I see no need to discuss the many cases cited in the voluminous briefs on this motion. The issue is intensely fact-oriented.

> Plaintiffs protest that their purpose in filing the complaint was to secure an American forum for their fraud claims against defendants. They say the purity

and fixity of their purpose should be inferred from the vigor with which they litigated their right to do so in this Court and the Court of Appeals. I accept that plaintiffs were also motivated by their forum preference, and that they did not go gently from it. It is commonplace, however, that the law recognizes multiple motives in human behavior. In this case plaintiffs had two motives. One was to pressure the Israeli Government to cease prosecution of the Jerusalem action against them by threatening to file, and eventually filing, a sensational complaint against the Government in New York. The other motive was to obtain American jurisdiction if the threats failed, as in fact they did. The conduct inspired by the first motive was improper.

*Id.* at 70–71.

After noting that the decision as to where an action is to be filed is "essentially a legal decision" typically made by a plaintiff's attorney, *id.* at 71, the court declined to sanction plaintiffs themselves and imposed the sanctions solely against Lewin. The court also indicated that the amount of the sanction was not intended to compensate defendants for the expense of defending the action in New York but rather was meant to deter similar filings.

Lewin has appealed the award of sanctions. Defendants have cross-appealed, contending that the amount of the award should have been higher.

## II. DISCUSSION

On appeal, Lewin contends that the sanctions award should be overturned because (1) the goal of pressuring BOI to withdraw or settle the Israeli action was not an improper purpose, and (2) even if such a purpose were improper, the filing of a complaint that is well grounded in fact and warranted by existing law cannot, as a matter of law, furnish a valid basis for the imposition of sanctions. Defendants seek to have sanctions upheld not only on the basis adopted by the district court but also on the grounds that the claims asserted in the complaint were frivolous (*see* defendants' brief on appeal at 9 ("preposterous"), 29 ("plainly foredoomed"), 32 ("patent-

ly dismissible")); that the choice of New York as a forum was likewise frivolous because it "lacked any legitimate reason," *id.* at 13 (*see also id.* at 11, 15, 17 (characterizing plaintiffs' legal arguments in favor of that forum as "tenuous," "contrived," and "farfetched")); and that the court should have awarded sanctions under 28 U.S.C. § 1927 on the ground that the filing of the New York complaint unreasonably and vexatiously multiplied litigation. They also argue that the award of sanctions should have been higher.

■ We review all aspects of a district court's award of sanctions under an abuse-of-discretion standard, *see, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990) (Rule 11 sanctions); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55, 111 S.Ct. 2123, 2138, 115 L.Ed.2d 27 (1991) (inherent power); *Milltex Industries Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir.1995) (inherent power); *Caisse Nationale De Credit Agricole–CNCA v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir.1994) (Rule 11); *Knipe v. Skinner*, 19 F.3d 72, 75 (2d Cir.1994) (Rule 11), giving recognition to the premise that "the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard" that informs its determination as to whether sanctions are warranted, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. at 402, 110 S.Ct. at 2459. We nonetheless remain mindful that "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* at 405, 110 S.Ct. at 2461; *see Derechin v. State University of New York*, 963 F.2d 513, 516 (2d Cir.1992); *United States v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1344 (2d Cir.1991).

Under this standard of review, we find that the imposition of sanctions in the present case constituted an abuse of discretion. The district court erred as a matter of law (a) in concluding that it is improper for an attorney to file a nonfrivolous complaint in a new and proper forum partly as a means of enhancing his client's chances of obtaining the settle-ment of another pending action, and (b) in concluding that sanctions may be imposed for the filing of a complaint that not only is not found to be frivolous but also wins for the plaintiff a measure of judicially imposed relief.

## A. Rule 11 Sanctions

The pre–1993 version of Rule 11, which is applicable to the present case, provided that an attorney's signature on a "pleading, motion, or other paper" constituted a certification that

> to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . .

Fed.R.Civ.P. 11 (as amended through 1992). This version of the Rule, with the exception of technical changes, *see* Fed.R.Civ.P. 11 Advisory Notes, was adopted in 1983. Although prior to 1983, Rule 11 contemplated the imposition of sanctions only upon a finding of bad faith, the 1983 revision of the Rule substituted an objective standard of reasonableness. *See generally Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253–54 (2d Cir.1985) ("*Eastway*") (citing Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 195 (1985) ("Schwarzer, *A Closer Look*")), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Applying the new objective standard in *Eastway*, we rejected the notion that an attorney who signed an objectively unreasonable court paper could escape the imposition of sanctions by showing that he had a good faith subjective belief in its validity, *see* 762 F.2d at 253 (attorney's good faith cannot serve as a "safe harbor"); and in *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986) ("*Oliveri*"), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987), we rejected the proposition that a court paper that was not objectively unreasonable could form the basis for the imposition of

sanctions where the attorney was guilty of only a subjective violation of the Rule, *see* 803 F.2d at 1275 ("[r]emoving any subjective good faith component from rule 11 analysis"). *See also Derechin v. State University of New York,* 963 F.2d at 520; *United States v. International Brotherhood of Teamsters,* 948 F.2d at 1344; *Kamen v. American Telephone & Telegraph Co.* 791 F.2d 1006, 1012 (2d Cir.1986). As discussed below, we conclude that the award of sanctions in the present case did not comply with the objective standard.

### 1. *Well Grounded in Fact and Law*

■ Preliminarily, we note our rejection of defendants' attempts to support the award of sanctions on the grounds that the claims asserted in the complaint and the selection of New York as a forum were frivolous. Under the objective standard, in order to warrant an award of Rule 11 sanctions on the basis that a complaint is not well grounded in fact or law, "it must be 'patently clear that a claim has absolutely no chance of success.'" *Oliveri* 803 F.2d at 1275 (quoting *Eastway,* 762 F.2d at 254). Plainly this standard was not met with respect to the claims asserted in the New York complaint, for the district court, as described in Part I.C.2. above, declined to find that they were not well grounded. Rather, the court explicitly refused to address the merits, and dismissed "without prejudice to the merits of plaintiff[s'] claims," thereby allowing them to be pursued in the Israeli action. Moreover, at least one of the conditions imposed by the court precedent to its actual dismissal of the complaint, *i.e.,* that defendants present assurances from the appropriate Israeli authorities that Sussman would not be detained in Israel should he go there in connection with the Israeli action, was designed specifically to enable plaintiffs' claims to be assessed on their merits. Accordingly, for purposes of Rule 11 analysis, their claims must be deemed nonfrivolous.

■ Nor can the award of sanctions be sustained on the ground that plaintiffs selected a forum inconvenient to defendants. To begin with, we are skeptical that the commencement of a suit in an inconvenient forum may be the basis of Rule 11 sanctions where venue was not improper. "Attorneys are not under an affirmative obligation to file an action in the most convenient forum; their only obligation is to file in a proper forum." *Newton v. Thomason,* 22 F.3d 1455, 1463–64 (9th Cir.1994) (reversing order imposing sanctions "for an 'unnecessary and frivolous' choice of venue," where district court found venue tenuous but not improper). In any event, defendants' assertion that the choice of forum here was without any rational basis lacks support in the district court's findings and in the record. Though the court stated that New York was "a highly doubtful venue," 154 F.R.D. at 70–71, it did not conclude that venue in New York was improper. Nor could it have concluded that there was no objectively reasonable basis for placing venue in New York, for plaintiffs alleged that BOI had used the New York branch of Bank Hapoalim in order to facilitate and conceal from plaintiffs BOI's improper participation in the NAB manipulations. *See* 28 U.S.C. § 1391(d), (f) (1988) (alien may be sued in any district; foreign state may be sued in any district in which a substantial part of events giving rise to the claim occurred). While the court found the branch-bank involvement to be a tangential contact with New York, and found this and other New York connections sufficiently outweighed by other factors to warrant the court's exercise of its discretion to dismiss for forum non conveniens, that exercise of discretion did not make venue in New York improper.

In sum, far from having found either plaintiffs' claims or their choice of forum frivolous, the court exercised its properly invoked jurisdiction to grant plaintiffs relief designed to ensure their opportunity to have those claims addressed on their merits in the Israeli action. The award of sanctions here cannot be upheld on the basis that the complaint or the choice of forum was not well grounded.

### 2. *Improper Purpose as Sanctionable*

■ The question remains whether the court could properly impose sanctions for the filing of a nonfrivolous complaint which resulted in the court's award of some benefits to plaintiffs, on the basis of its finding that plaintiffs also had a purpose that was not proper. This Court has not squarely ad-

dressed the question. In one case we stated that "[e]ven if there is an arguable legal and factual basis for a motion, an attorney or party violates Rule 11 by presenting that motion to the court for an improper purpose," *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 831 (2d Cir.1992); but that statement was dictum, since we overturned the award of sanctions because the challenged motion had a reasonable legal basis and the district court had not found an improper purpose, *see id.* In a later decision in *Knipe v. Skinner*, we expressly declined to reach the question "of whether a complaint that is warranted by existing law may be sanctionable if filed for the improper purpose of harassment," because in that case the complaint both lacked a good faith basis and had been filed to harass. 19 F.3d at 77.

In the article relied on in *Eastway*'s discussion of the 1983 change from a subjective to an objective standard in Rule 11 analysis, Judge Schwarzer emphasized that an objective standard of analysis is required even with respect to whether a filing was made with an improper purpose. *See* Schwarzer, *A Closer Look*, 104 F.R.D. at 195. Thus, the court is not to "delve into the attorney's subjective intent" in filing the paper, but rather should assess such objective factors as

> whether particular papers or proceedings caused delay that was unnecessary, whether they caused increase in the cost of litigation that was needless, or whether they lacked any apparent legitimate purpose. Findings on these points would suffice to support an inference of an improper purpose. The court can make such findings guided by its experience in litigation, its knowledge of the standards of the bar of the court, and its familiarity with the case before it, and by reference to the relevant criteria under the Federal Rules such as those in Rule 1 and Rule 26(b)(1).

> It is crucial to the effectiveness of Rule 11 that this approach be followed. Were a court to entertain inquiries into subjective bad faith, it would invite a number of potentially harmful consequences, such as generating satellite litigation, inhibiting speech and chilling advocacy....

> ....

> .... If a reasonably clear legal justification can be shown for the filing of the paper in question, no improper purpose can be found and sanctions are inappropriate.

Schwarzer, *A Closer Look*, 104 F.R.D. at 195–96 (footnote omitted).

The courts have expressed somewhat divergent views as to whether an improper purpose can warrant the imposition of sanctions for a nonfrivolous filing. In *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir.1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988), the Seventh Circuit stated that "filing a colorable suit for the purpose of imposing expense on the defendant rather than for the purpose of winning" would be sanctionable under Rule 11. Several other Circuits have distinguished between complaints and other court papers, taking the view that, whatever the analysis applicable to motions and other papers filed after the commencement of the litigation, special care must be taken to avoid penalizing the filing of a nonfrivolous complaint, for otherwise a plaintiff who has a valid claim may lose his right "to vindicate his rights in court," *National Association of Government Employees, Inc. v. National Federation of Federal Employees*, 844 F.2d 216, 224 (5th Cir.1988); *see also Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.1990) (en banc) (imposition of sanctions inappropriate for filing of a nonfrivolous complaint "even when the motives for asserting those claims are not entirely pure"); *Burkhart v. Kinsley Bank*, 852 F.2d 512, 515 (10th Cir.1988) (if complaint filed were not frivolous, "then any suggestion of harassment would necessarily fail").

In *Townsend v. Holman Consulting Corp.*, the Ninth Circuit's analysis was as follows:

> Although the "improper purpose" and "frivolousness" inquiries are separate and distinct, they will often overlap since evidence bearing on frivolousness or non-frivolousness will often be highly probative of purpose. The standard governing both inquiries is objective.... With regard to complaints which initiate actions, we have held that such complaints are not filed for an improper purpose if they are non-frivo-

lous.... Since subjective evidence of the signer's purpose is to be disregarded, ... the "improper purpose" inquiry subsumes the "frivolousness" inquiry in this class of cases. The reason for the rule regarding complaints is that the complaint is, of course, the document which embodies the plaintiff's cause of action and it is the vehicle through which he enforces his substantive legal rights. Enforcement of those rights benefits not only individual plaintiffs but may benefit the public, since the bringing of meritorious lawsuits by private individuals is one way that public policies are advanced.... [I]t would be counterproductive to use Rule 11 to penalize the assertion of non-frivolous substantive claims, even when the motives for asserting those claims are not entirely pure.

.... [A] determination of improper purpose must be supported by a determination of frivolousness when a complaint is at issue.

*Id.* at 1362 (footnote omitted).

We are in agreement with the *Townsend* analysis, especially in circumstances such as those present here, where the court not only did not find the claims to be objectively unreasonable but imposed restrictions on defendants in an effort to ensure that plaintiffs would have an adequate opportunity to have their claims adjudicated on the merits. A party should not be penalized for or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper.

### 3. *Whether the Criticized Purpose Was Improper*

■ Finally, we turn to the question of whether the finding that there was an improper purpose was correct. The district court held that the filing of the complaint with a view to exerting pressure on defendants through the generation of adverse and economically disadvantageous publicity reflected an improper purpose. To the extent that a complaint is not held to lack foundation in law or fact, we disagree. It is not the role of Rule 11 to safeguard a defendant from public criticism that may result from the assertion of nonfrivolous claims. Further, unless such measures are needed to protect the integrity of the judicial system or a criminal defendant's right to a fair trial, a court's steps to deter attorneys from, or to punish them for, speaking to the press have serious First Amendment implications. Mere warnings by a party of its intention to assert nonfrivolous claims, with predictions of those claims' likely public reception, are not improper.

Nor do we think it was appropriate for the district court to find that Lewin's prelitigation letters were evidence that the New York complaint was filed for an improper purpose. It is hardly unusual for a would-be plaintiff to seek to resolve disputes without resorting to legal action; prelitigation letters airing grievances and threatening litigation if they are not resolved are commonplace, sometimes with salutary results, and do not suffice to show an improper purpose if nonfrivolous litigation is eventually commenced. Indeed, it would be ironic to hold that Rule 11 sanctions may be awarded based solely on evidence that the plaintiff has given the defendant a warning that the complaint will be filed unless an allegedly tortious lawsuit is withdrawn, in light of the fact that the current version of Rule 11 itself, *see* Fed. R.Civ.P. 11(c)(1) (effective Dec. 1, 1993), essentially forbids the filing of a motion for sanctions unless the movant has given his opponent a warning that such a motion will be filed if the allegedly sanctionable paper is not withdrawn.

### B. *Inherent Power*

■ A court has the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct. *See, e.g., Chambers v. NASCO,* 501 U.S. at 43–50, 111 S.Ct. at 2132–36. While Rule 11 extends only to papers filed with the court, the court's inherent power is broader and would permit the court to impose sanctions on the basis of related bad-faith conduct prior to the commencement of the litigation, *see Chambers v. NASCO,* 501 U.S. at 36, 40–41, 44, 111 S.Ct. at 2128, 2130–31, 2132–33. Though the imposition of sanc-

**460**

tions for bad faith obviously entails an inquiry that is at least in part subjective, we conclude that the court's use of its inherent power in the present case constituted an abuse of discretion, for the court's expressed goal of deterrence was inappropriate with respect to a complaint whose merits were not addressed and whose filing properly led the court to grant some relief to the plaintiffs.

We note that the award of sanctions would have been no more supportable if it had been designed to compensate defendants for attorneys' fees and other expenses. The general American rule is that a prevailing party in federal court litigation cannot recover attorney's fees, *see Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616–17, 44 L.Ed.2d 141 (1975), and an exception for bad-faith conduct may be made only where there is " 'clear evidence' that the claims 'are entirely without color *and* made for reasons of harassment or delay or for other improper purposes.' " *Eastway,* 762 F.2d at 253 (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1088 (2d Cir.1977)) (emphasis in *Eastway* ). Even assuming that defendants could be regarded as the prevailing parties in this controversy whose merits have not been determined, defendants did not meet the exception to the American Rule since they did not persuade the district court that the claims asserted in the New York complaint were without color.

Finally, we note that though defendants sought sanctions under 28 U.S.C. § 1927 as well as under Rule 11 and the court's inherent power, arguing that the filing of the complaint had needlessly and vexatiously multiplied the litigation, the court plainly did not treat the present action as congruent with the Israeli action, for it refused to dismiss the New York action unconditionally and instead granted plaintiffs relief that they had previously been unable to obtain from defendants. In the circumstances, it cannot be concluded that the filing of the New York complaint either was in bad faith or caused "delay that was *unnecessary* " or initiated "litigation that was *needless* " or without "*any* apparent legitimate purpose." Schwarzer, *A Closer Look,* 104 F.R.D. at 195

(noting similarity between § 1927 and purpose element of Rule 11) (emphasis added). The court properly denied defendants' request for an award of sanctions under § 1927.

### CONCLUSION

We have considered all of defendants' arguments in support of sanctions and have found them to be without merit. In light of our conclusion that an award of sanctions was improper on any of the bases proffered below, defendants' cross-appeal, arguing that the sanctions should have been more severe, is moot.

So much of the judgment as imposed sanctions against Lewin is reversed. The cross-appeal is dismissed.