In re ST. JOHNSBURY TRUCKING
CO., INC., Debtor.

The OFFICIAL COMMITTEE OF UNSE-
CURED CREDITORS OF ST. JOHNS-
BURY TRUCKING COMPANY, INC.,
and St. Johnsbury Trucking Company,
Inc., Plaintiff,

v.

BANKERS TRUST COMPANY,
as agent, Defendant.

BANKERS TRUST COMPANY,
as agent, Counterclaimant,

v.

ST. JOHNSBURY TRUCKING COMPA-
NY, INC., and William M. Clifford,
Counterclaim Defendants.

Bankruptcy No. 93–B–43136 (FGC).
Adv. No. 93–1073.

United States Bankruptcy Court,
D. Vermont.

June 28, 1995.

448

C.O'C. Reis of Obuchowski & Reis, Bethel, VT; and, S.L. Chenetz and R. Levy, Jr. of Marcus Montgomery, Wolfson, P.C., New York City, for Official Committee of Unsecured Creditors (Committee).

H. Berman and M.D. Bloom of Greenberg, Traurig, Hoffman, Rosen & Quentel, New York City, for St. Johnsbury Trucking Co., Inc. (debtor).

G.J. Vitt and C. Platto of Brooks, McNally, Whittington, Platto & Vitt, Norwich, VT; and R.B. Fiske, Jr. of Davis, Polk & Wardwell, New York City, for Bankers Trust Co. (BT) and B.M. Freeman.

K. McAndrew and S.R. Knapp of Dinse, Erdmann & Clapp, Burlington, VT, for Winthrop, Stimson, Putnam & Roberts (WSP & R) and L.T. Crowley.

M.A. Cooper of Sullivan & Cromwell, New York City, and P.F. Langrock, of Langrock

Sperry & Wool, Middlebury, VT, for O'Melveny & Myers (O'M & M) and A.C. Harris.

J. Sigel and S.T. Hoort of Ropes & Gray, Boston, MA, for William M. Clifford (Sanctions Counsel).

## MEMORANDUM OF DECISION ORDERING *IN CAMERA* REVIEW OF ALLEGEDLY PRIVILEGED MATERIALS

FRANCIS G. CONRAD, Bankruptcy Judge.

Sanctions Counsel moves[1] for an order requiring Bankers Trust Co. (BT), its former counsel, O'Melveny & Myers ("O'M & M"), and its present counsel, Winthrop, Stimson, Putnam & Roberts (WSP & R), collectively the "Sanctions Parties", to submit to us, for *in camera* review, documents claimed by the Sanctions Parties to be privileged. We will grant the motion, and order that the review be conducted by Senior Bankruptcy Judge Charles J. Marro.

This Memorandum of Decision begins with a review of the factual background which led to our finding that a prima facie case had been made out that one or more of the Sanctions Parties violated F.R.Bkrtcy.P. 9011 and/or perpetrated a fraud upon the Court, and to our appointment of Sanctions Counsel to investigate. We then review the effect of an opinion issued by the District Court for the Southern District of New York (SDNY) in an almost parallel sanctions proceeding,[2] since settled, on our decision today. We conclude that it has none. The SDNY opinion, however, does serve as a useful tool for clarifying our prior and present holdings, and for discussing the standards applicable to *in camera* review of documents under the facts presented.

## FACTUAL BACKGROUND

Debtor evolved from a family-owned trucking firm operating from St. Johnsbury, Vermont, into a large regional carrier with headquarters in Holliston, Mass. When it moved its corporate headquarters to Massachusetts, it retained many of its operations in Vermont, including some billing and collections functions. Along the high speed highway to economic ruin, Debtor was purchased in a leveraged buyout[3] that soon broke down, leading to several financial restructurings, and resulting eventually in the pending bankruptcy case.

The final pre-bankruptcy restructuring took place in February 1993. Debtor's President and CEO, William Clifford, signed a Security Agreement giving BT, as Collateral Agent for the various lenders involved, a security interest in, *inter alia*, Debtor's accounts receivable and contract rights. As drafted, apparently by O'M & M, the Security Agreement had Debtor and Clifford making a representation and warranty to BT that

> the chief place of business and chief executive office of [Debtor] and the office where [Debtor] keeps its records concerning the [accounts receivable and contract rights] ... are located at 119 Jeffrey Avenue, Holliston, Massachusetts 01746.

*1993 Security Agreement*, § 4(a). Substantially identical representations had been made in connection with earlier financial restructurings in 1986, 1987, and 1989. About four months after the last restructuring, on June 15, 1993, Debtor filed its petition for relief in the Southern District of New York. In November 1993, Debtor and Committee brought this adversary proceeding in Vermont, alleging in their Complaint that

> At all times since entering into [the August 1989 financial restructuring agreement], the Company kept and maintained its rec-

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to the Court under Part V of the Local District Rules for the District of Vermont. This is a core matter under 28 U.S.C. § 157(b)(2)(A), (K), and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bkrtcy.P. 7052.

2. The New York Sanctions Proceeding involved the main case, while this proceeding emanates from an adversary proceeding filed in Vermont.

3. The leveraged buyout and later restructurings were the subject of an adversary proceeding in the Southern District of New York, which was ultimately settled.

ords concerning the Accounts Receivable at its office located in St. Johnsbury, Vermont.

*Complaint for Declaratory Relief and to Determine Validity and Extent of Lien,* 18. Because BT had failed to file a UCC Financing Statement in Vermont,[4] Plaintiffs claimed BT had not perfected its security interest in the accounts receivable and contract rights.

BT counterclaimed against Debtor and Clifford,

> both individually and in his capacity as President of the Debtor, respectively, for misrepresentation in connection with the Debtor's grant and/or continuation of a security interest in and lien on its accounts receivable and contract rights.... To the extent that Plaintiffs prove the allegations set forth in the Complaint, it will *a fortiori* prove that the Debtor and Mr. Clifford misrepresented to Bankers the location of the office containing the records concerning the Debtor's accounts receivable and contract rights.

*Amended Counterclaim of Bankers Trust Company, Statement of Counterclaim,* 2. BT's Amended Counterclaim recited the various repetitions of the representation through the years, *id.,* at 7, 12, 17, 25, and alleged in connection with each that in reliance on the particular representation, BT had filed in Massachusetts to perfect its lien, *id.,* at 8, 13, 18, 26, and had not filed in Vermont. *Id.,* at 9, 14, 19, 27. The allegations of reliance in connection with the 1993 restructuring, for example, were as follows:

> 64. In reliance upon these representations and warranties, and in order to clarify that Bankers held a security interest in the Debtor's accounts receivable and contract rights as Collateral Agent, Bankers filed a UCC–3 financing statement with the Massachusetts Secretary of State,

which amended the identity of the secured party from "Bankers Trust Company, as Agent" to "Bankers Trust Company, as Collateral Agent."

> 65. In reliance upon these representations and warranties, Bankers did not file any UCC financing statement in Vermont in connection with the 1993 Security Agreement.

*Id.* The amount at stake in the Vermont Adversary has been estimated at about $30 million.

In September 1994, O'M & M inadvertently[5] produced a document that it asserts was subject to the attorney-client privilege. The memo, a January 10, 1994 memorandum from an O'M & M attorney to BT employees ("O'M & M Memo"), was dated after the Vermont Adversary was filed, but four days before BT filed its counterclaim. We infer from its content that it was intended to address a crucial element of the Counterclaim—the issue of BT's reliance on the Clifford representation. The memo's content certainly bears directly on that issue. The document summarized earlier discussion among BT's counsel and BT's employees. "The purpose of that discussion," the memo states, "was to provide us with an understanding of what information BT had, based upon its collateral audits, regarding the location of the records concerning St. Johnsbury's accounts receivables." A footnote states:

> We are not sure when BT first learned that St. Johnsbury maintained an accounts processing and records storage facility in St. Johnsbury, Vermont. Although BT may not have known this information at the time it initially took a security interest in accounts receivable in 1986, however, BT certainly knew by the time the renewed representations and amended filings

---

**4.** At the time the Vermont Adversary was filed, Vermont was the only state in the nation that required a Uniform Commercial Code filing where the accounts receivable are located to perfect a security interest in them. Other states uniformly require that filing be where the debt-

or's principal office is located. Vermont recently joined the rest of the nation.

**5.** The inadvertent disclosure of various materials was the subject of several conferences, sometimes by phone. Our memory is that the memo

were made in 1989 and 1993.[6]

O'M & M Memo, 2 n. 2.

The O'M & M Memo was disclosed on the eve of hearings on the confirmation of a proposed Plan of Reorganization. BT was a co-proponent of the Plan with Debtor. The Plan proposed to settle the Vermont Adversary against BT but not BT's Counterclaim against Clifford. A 75 percent share of any recovery against Clifford was set aside for distributions to unsecured creditors. The Disclosure Statement plainly stated that the prospect of recovery was uncertain. That was a material misstatement of the relevant facts. The O'M & M Memo made it clear that the prospect of a recovery, far from being uncertain, was non-existent. The Memo also suggests that after a careful investigation determined that a crucial element of the Counterclaim—reliance—was missing, BT asserted it anyway. The effect of the disclosure was to crater the Chapter 11 Plan. It took about a year and several million dollars in professional fees to fill in the hole and construct a marginal dirt road upon

which the parties in interest could haul their interests to the confirmation terminal.

We had already begun to suspect that the Counterclaim lacked merit.[7] The O'M & M Memo forced us to confront the possibility that BT had intentionally filed a Counterclaim it knew to be without merit. Laymen call this lying. No legitimate reason for doing so was apparent to us. What was apparent to us was that BT had used what appeared to be a bogus counterclaim as a sword and shield to thwart the determination of the Vermont Adversary, and to force a cash-strapped, litigation-weary Debtor to settle the adversary proceeding and the main case on its terms. Given this state of affairs, the Plan was doomed, because it invited creditors to hope in the hopeless, that a meritless counterclaim might produce a recovery. Accordingly, we *sua sponte* commenced proceedings to determine whether sanctions were warranted in both Vermont and SDNY, ordering all privileged documents turned over to Sanctions Counsel. The Sanctions Parties appealed and moved the District

---

twice passed through "quality control checks" without being recalled and claimed as privileged.

6. The memo contains other factual conclusions about the state of BT's knowledge of the location of the accounts receivable records that bear directly on the issue of reliance. Examples include:

Certain audits were conducted exclusively in Holliston, although they included the review of certain records which BT knew had been physically transferred from St. Johnsbury, Vermont (where they were stored).

O'M & M Memo, 2.

We understand that the accounts receivable subledger, accounts receivable agings and related information were maintained on St. Johnsbury's mainframe computer, which was physically located in St. Johnsbury, Vermont. *Id.*, 2 n. 1.

In connection with certain collateral audits, BT personnel visited St. Johnsbury's facility in St. Johnsbury, Vermont. BT recognized that, as of the Petition Date and during all relevant times prior to that date, St. Johnsbury maintained the following records concerning accounts receivable at that facility: (i) copies of certain bills of lading, (ii) copies of certain invoices, and (iii) microfiche of older bills of lading and invoices.

*Id.*, 2–3 (footnotes omitted).

BT also recognized that, as of the Petition Date and during all relevant times prior to that date, St. Johnsbury's accounts receivable collection group was located in St. Johnsbury,

Vermont, and that Alan Crosbie [Director of Collections and Revenue] maintained his office at that facility. *Id.*, at 3.

7. For example, the construction of a Collection Account Agreement among Debtor, BT, and a Vermont Bank was at issue in earlier chapters of the Vermont Adversary litigation. *See St. Johnsbury Trucking Co., Inc. v. Bankers Trust Co. (In re St. Johnsbury Trucking Co., Inc.),* 1994 WL 18686 *1 (Bkrtcy.D.Vt.1994). As we noted in *St. Johnsbury Trucking Co., Inc. v. Bankers Trust Co. (In re St. Johnsbury Trucking Co., Inc.),* 1994 WL 608798 *2 (Bkrtcy.D.Vt.):

The collection account ... was, in Bankers' own characterization, "an integral component of a complex cash management system that allowed St. Johnsbury to borrow and repay working capital on a daily basis." Bankers' December 29, 1993 Post–Hearing Reply, 11. Debtor was required to deposit the proceeds of accounts receivable ... into the collection account ... and then to transfer cleared funds to Bankers' to pay down the indebtedness. The collection account was thus an important piece of the system constructed by the parties to process the accounts receivable....

It would be a curious thing indeed to contract for a collections account in a bank where the receivables weren't. The fact that BT did so contract suggested early on that BT knew that accounts receivable records were located in Vermont.

Courts in Vermont and SDNY for a writ of mandamus ordering us to vacate our orders that privileged matters be disclosed. By agreement of the parties and the District Court judges, the appeal and mandamus went forward in SDNY, but was held in abeyance in Vermont. SDNY Judge Martin entered a Memorandum Opinion and Order on December 9, 1994, granting the Sanctions Parties' motion for writ of mandamus, *In re St. Johnsbury*, 176 B.R. 122 (S.D.N.Y.1994) (hereinafter "SDNY Opinion"), from which order Sanctions Counsel appealed. The SDNY sanctions proceeding has since been settled as part of a global settlement in connection with formulation of another Plan of Reorganization, which we confirmed today.[8]

## DISCUSSION

 The Second Circuit has, very recently, discussed at length the standards to be applied when determining whether to impose sanctions for filing of a complaint. *Sussman v. Bank of Israel*, 56 F.3d 450 (2d Cir.1995). A counterclaim is a species of complaint, so the Court's discussion there applies here.[9] "[I]n order to warrant an award of Rule 11 sanctions on the basis that a complaint is not well grounded in fact or law, 'it must be patently clear that a claim has absolutely no chance for success.'" *Id.*, 56 F.3d at 457 (citations omitted). The Court "rejected the notion that an attorney who signed an objectively unreasonable court paper could escape the imposition of sanctions by showing that he had a good faith subjective belief in its validity." *Id.*, 56 F.3d at 456. The Second Circuit has also made it clear that we must use an objective standard

to determine whether a filing was made with an improper purpose.

> [T]he court is not to "delve into the attorney's subjective intent" in filing the paper, but rather should assess such objective factors as
>
> > whether particular papers or proceedings caused delay that was unnecessary, whether they caused increase in the cost of litigation that was needless, or whether they lacked any apparent legitimate purpose. Findings on these points would suffice to support an inference of an improper purpose. The court can make such findings guided by its experience in litigation, its knowledge of the standards of the bar of the court, and its familiarity with the case before it, and by reference to the relevant criteria under the Federal Rules such as those in Rule 1 and Rule 26(b)(1).

*Id.*, 56 F.3d at 458, *quoting*, Schwarzer, Sanctions Under the New Federal Rule 11—A Closer Look, 104 F.R.D. 181, 195 (1985). Where a complaint or counterclaim is involved, a determination of an objectively improper purpose must be supported by a finding that the pleading is objectively unreasonable. *Id.*, 56 F.3d at 458–59. We note that Fed.R.Civ.P. 1 and the correlative Fed. R.Bkrtcy.P. 1001 both require that the rules of procedure be construed "to secure the just, speedy, and inexpensive determination of every action."

 For the reasons that follow, we believe the proceedings to date in the Vermont Adversary and in the main case in SDNY[10] suggest strongly that the counterclaim was an objectively unreasonable pleading that was filed for an objectively improper purpose

---

**8.** Second Circuit Judge Fred Parker, sitting by designation to the District of Vermont, has recently issued an order in connection with the appeal and mandamus in the Vermont adversary. The concurrent effect of Judge Parker's order and settlement of the SDNY Sanctions Proceeding makes it unclear whether our original order of disclosure in the Vermont Sanctions Proceeding is subject to a stay. The parties should be prepared to discuss this issue at the next status conference.

**9.** Fed.R.Civ.P. 11 was modified significantly in 1993. The Court's discussion in *Sussman* pertains to the pre–1993 rule. Fed.R.Bkrtcy.P. 9011

was not revised, and its relevant language continues to track the language of the older Rule 11. Accordingly, the Court's analysis of the pre–1993 Rule 11 controls our decisions under Rule 9011.

**10.** As noted earlier, the SDNY sanctions proceeding has been settled. Accordingly, the Sanctions Parties are not liable for any costs that may have accrued in connection with proceedings in the main case. The settlement does not, however, cloak the Sanctions Parties' conduct in that venue from scrutiny by Sanctions Counsel to the extent necessary to put the Sanctions Parties conduct in this Court in the proper context.

and that imposed extraordinary costs upon the Debtor's estate, its creditors, and the Bankruptcy Court.[11] That confluence of elements—an objectively unreasonable pleading filed for an objectively improper purpose that results in extraordinary costs to other litigants and to Bankruptcy Courts in two venues—is not just sanctionable conduct under Rule 11, but, we believe, amounts to fraud upon the court. We turn now to that subject.

■ As noted above, Judge Martin of the District Court for the Southern District of New York issued a Memorandum Opinion and Order granting the Sanctions Parties' request for a writ of mandamus directing us to vacate our order that privileged documents be made available to Sanctions Counsel. SDNY Opinion *supra*, 176 B.R. 122. That opinion, the Sanctions Parties argue, "forecloses any argument that Respondents attempted to mislead the Court." Sanctions Parties' Memorandum opposing *in camera* review, at 1. We disagree for several reasons.

First, we are in Vermont now, and Circuit Court Judge Fred Parker, sitting by designation to the Vermont District Court, has very recently clarified the effect of the rulings by Judge Martin in the Southern District of New York on the Vermont Sanctions Proceedings. Judge Parker noted that he had not "agree[d] to transfer jurisdiction of the District of Vermont case to Judge Martin, or in any way cede[d] my jurisdiction to the United States District Court for the Southern District of New York, nor did I make any ruling of consolidation of the two cases." Accordingly, Judge Parker expressly "decline[d] to execute the proposed order submitted by respondents granting the writ of mandamus and making any further orders of the United States District Court for the Southern District of New York binding upon this Court."

■ Although without effect on this proceeding, analysis of Judge Martin's opinion serves as a useful tool for clarifying our findings and discussing the appropriate standards. Judge Martin's opinion, for example, assumes that the communications at issue are confidential under the attorney-client privilege. SDNY Opinion, *supra*, 176 B.R. at 125.

Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged. The purpose of the privilege is to encourage clients to make full disclosure to their attorneys. As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice. However since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose. *Accordingly it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.*

*Fisher v. U.S.*, 425 U.S. 391, 403–04, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) (emphasis added). "[T]he privilege is triggered only by a client's request for legal ... advice." *In re Grand Jury Subpoena*, 731 F.2d 1032, 1037 (2d Cir.1984). In this case, O'M & M's representation of BT was intertwined with the pursuit of O'M & M's own interest in assuring that its prior legal work did not leave it liable to BT for malpractice.[12] Depending upon the circumstances, it may be that the communications between BT and O'M & M are not protected by the attorney-client privilege because they are "analogous to ... communications made to a lawyer active as a

---

**11.** In the event that our determination of this matter is taken up on appeal, we implore the reviewing court to consider carefully the distinctive nature of the Bankruptcy Court. This proceeding is not a private struggle, but an attempt to bring justice to a large community of interests. Moreover, if the evidence confirms that a fraud on the court was indeed committed, the victims include not just Mr. Clifford and his insurance

company, but also the thousands of creditors in this case.

**12.** Among the matters settled by the SDNY Sanctions Proceeding Settlement is BT's malpractice claim against O'M & M, which is subject to a confidentiality order.

business advisor or witness to a transaction; the type of professional relationship that the privilege was designed to foster is absent." Note, The Future Crime or Tort Exception to Communications Privileges, 77 Harv. L.Rev. 730, 731 (1964). We see no basis for concluding, for example, that the privilege attaches to communications from BT to O'M & M serving notice of O'M & M's potential liability, or to any tolling agreement between the two,[13] or to communications from O'M & M to BT asking for an opportunity to salvage the situation, or from either one to the other discussing the terms and strategy for O'M & M's efforts to save itself from a malpractice lawsuit. The privilege protects the client, not the client's attorney. "The existence of the relationship requisite for privilege is a question of preliminary fact that under the usual evidentiary rule is decided by the trial judge." *Id.*, at 736.

Judge Martin's opinion also confuses "fraud" with "fraud upon the court." We have, we believe, consistently stated the issue in terms of "fraud upon the court," not "fraud."[14] Judge Martin, however, found on the record before him that no prima facie case of fraud existed. SDNY Opinion, 125. As the District Court noted, "Fraud connotes intentional concealment and the record does not support a finding that [BT] concealed any relevant facts." *Id.* A fraud on the court, by contrast,

> occurs when it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable

scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by hampering the presentation of the opposing party's claim or defense.

*Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989). "Because corrupt intent knows no stylistic boundaries, fraud on the court can take many forms." *Id.* Depending on the circumstances, certain conduct, "though no actual fraud was perpetrated, may well be a 'legal' fraud ... upon the judicial institution." 7 J. Moore, Moore's Federal Practice 60.33, at 60-358 (2d ed. 1995). *See also, United Business Communications, Inc. v. Racal-Milgo, Inc.*, 591 F.Supp. 1172, 1186 (D.Kan.1984) ("the question of fraud on the court must turn upon the facts of each case. Fraud on the court 'is a nebulous concept.' The controlling factors appear to be whether the misconduct tampers with the judicial machinery and subverts the integrity of the court itself."[15] (Citations omitted)). In short, the issue the District Court decided—fraud—was not the issue we presented in our holdings.

■ The issue the District Court decided is also not the issue now before us. The issue before Judge Martin was whether putatively privileged documents should be turned over to Sanctions Counsel.[16] The issue before us now is whether the claim of privilege should be subject to judicial scrutiny via *in camera* review. We had previously ordered privileged documents turned over to Sanctions Counsel. The District Court deter-

13. Sanctions Counsel reported to us at the April 26, 1995 hearing in this matter that it had learned that BT and O'M & M had entered into a tolling agreement. Record, 12.

14. In our "Order Commencing Proceedings to Determine Whether Sanctions Should be Imposed" in the Vermont Adversary, we stated that the issue was whether the Sanctions Parties' "conduct ... violates Rule 9011 of the Federal Rules of Bankruptcy Procedure and/or constitutes the perpetration of fraud upon the United States Bankruptcy Court for the District of Vermont." *Committee v. Bankers Trust (In re St. Johnsbury Trucking Co., Inc.)*, No. 93-1073, slip op. at 1 (Bkrtcy.D.Vt. October 27, 1994). We also found that the conduct in question "constitutes ... a *prima facie* case of perpetrations of fraud upon this Court and the New York Court...." *Id.*, at 2. The same language ap-

pears in the parallel order entered in the main case in SDNY. *In re St. Johnsbury Trucking Co., Inc.*, No. 93-43136, slip op. (October 27, 1994). Similarly, in the September 29, 1994 hearing in the main case, we stated, "I also believe that there is a prima facie case that a fraud was perpetrated upon the Court...." Transcript, at 28.

15. The Court and the lawyers who practice before it are brothers and sisters in the legal process. Like brothers and sisters in a family, we are raised in our profession to play certain games by certain rules. We are also taught not to twist our relationship struggles such that one of our brothers or sisters uses the Court to ensnare an innocent party.

16. *But see*, n. 8.

mined that the crime-fraud exception to the attorney-client privilege did not apply because "the facts before the Bankruptcy Court did not establish probable cause to believe that [BT] had been guilty of a crime or fraud." Judge Martin's recitation of the "probable cause" standard of *John Doe, Inc. v. U.S. (In re John Doe, Inc.)*, 13 F.3d 633, 637 (1994) omits the Second Circuit's expanded discussion of that standard in *In re Grand Jury Subpoena Duces Tecum, supra*, 731 F.2d at 1039:

> The crime or fraud need not have occurred for the exception to be applicable; it need only have been the objective of the client's communication. And the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent.... Finally, the client need not have succeeded in his criminal or fraudulent scheme for the exception to apply. If a fraudulent plan were ineffective, the client's communications would not thereby be protected from disclosure.

Thus, the standard is not "probable cause" to believe that a fraud or crime has been committed, but requires "that a prudent person have a reasonable basis to *suspect* the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *John Doe, supra*, 13 F.3d at 637. In any event, the issue, at least for now, is not whether to order the documents turned over, but whether to order an *in camera* review of the materials to determine, based upon their contents, whether they should be turned over.[17] This is, in short, merely a discovery matter.

As the Supreme Court has noted,

> "No matter how light the burden of proof which confronts the party claiming the exception, there are many blatant

abuses of privilege which cannot be substantiated by extrinsic evidence. This is particularly true ... of ... situations in which an alleged illegal proposal is made in the context of a relationship which has an apparent legitimate end."[18]

*U.S. v. Zolin*, 491 U.S. 554, 568, 109 S.Ct. 2619, 2629, 105 L.Ed.2d 469 (1989), *quoting* Note, The Future Crime or Tort Exception, *supra*, 77 Harv.L.Rev. at 737 (1964).

Accordingly, "in camera proceedings may be used to determine whether the exception applies to particular communications." *John Doe, supra*, 13 F.3d at 636. "[D]isclosure of allegedly privileged materials to the district court[19] for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege." *Zolin, supra*, 491 U.S. at 568, 109 S.Ct. at 2629, 105 L.Ed.2d at 469. Because " 'in camera inspection ... is a smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure,' " the Supreme Court has

> conclude[d] that a lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege. The threshold we set, in other words, need not be a stringent one.

*Id.*, 491 U.S. at 572, 109 S.Ct. at 2630–31, *quoting*, Fried, Too High a Price for Truth: The Exception to the Attorney–Client Privilege for Contemplated Crimes and Frauds, 64 N.C.L.Rev. 443, 467 (1986) (citations omitted).

■ The standard adopted by the Supreme Court in *Zolin* is indeed "not ... a stringent one:"

> Before engaging in in camera review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person" that in camera review of the mate-

---

**17.** The Sanctions Parties assert that "it would be inappropriate for this Court, as the ultimate decision-maker in the sanctions proceeding, to review Respondents' privileged materials." Sanctions Parties Memorandum at 2. We concur, as we have noted several times on the record, and will assign the matter to Senior Bankruptcy Judge Charles J. Marro.

**18.** As we note hereafter, BT's rights as a creditor in bankruptcy appear to have been usurped by O'M & M, its former counsel, to protect O'M & M from the consequences of O'M & M's own actions.

**19.** The Bankruptcy Court is a unit of the District Court. 28 U.S.C. § 151.

**456**

rials may reveal evidence to establish the claim that the crime-fraud exception applies.

*Id.,* 491 U.S. at 572, 109 S.Ct. at 2631, *quoting Caldwell v. District Court,* 644 P.2d 26, 33 (Colo.1982). We believe, as noted above, that the record suggests that the BT Counterclaim was an objectively unreasonable pleading filed for an objectively improper purpose that resulted in extraordinary cost to the Debtor, its creditors, and the Court. Our reasons for that belief, to which we shortly turn, satisfy the *Zolin* test.

▆▆▆▆▆ Finally, we do not believe that Judge Martin's opinion forecloses us from ordering *in camera* review because he assumed that the crime-fraud exception to the attorney-client privilege requires either a crime or a fraud. SDNY Opinion, 176 B.R. at 125. We believe that both principle and precedent admit a different exception, one that is sometimes larger and sometimes smaller. As noted above, the attorney-client privilege "applies only where necessary to achieve its purpose." *Fisher v. U.S., supra,* 425 U.S. at 403, 96 S.Ct. at 1577. Thus, the exception is not really an exception, but an "exclusion," *In re Grand Jury Subpoena,* 731 F.2d 1032, 1038 (2d Cir.1984), representing not an inroad upon the privilege, but a limit on its reach.

> Whereas confidentiality of communications and work product facilitates the rendering of sound legal advice, advice in furtherance of a fraudulent or unlawful goal cannot be considered "sound." Rather advice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection.

*In re Grand Jury Subpoena, supra,* 731 F.2d at 1038. Precedent and authority also recognize that not just technical crimes or frauds are excluded from the attorney-client privilege. The Second Circuit, for example, invoked the exclusion in response to the non-criminal "intent to hinder or delay the government's collection of moneys owing to it." *Id.,* at 1041. Wigmore states, "It has been agreed from the beginning that the privilege cannot avail to protect the client in concerting with the attorney a crime or other evil enterprise." 8 Wigmore, Evidence § 2298,

at 572 (McNaughton rev. 1961). One commentator notes that "courts have expanded the exception by exploiting the notorious ambiguity of the word 'fraud' to include many kinds of wrongdoing that do not qualify as civil fraud in the strict sense." Fried, Too High a Price, *supra,* 64 N.C.L.Rev. at 499 n. 2. "The attorney-client privilege has always been subject to the qualification that protection is denied to communications where a lawyer's assistance is sought in activity that the client knows to constitute a crime or tort." Note: The Future Crime or Tort Exception to Communications Privileges, 77 Harv.L.Rev. 730, 730–31 (1964). We believe that the principle served by both the attorney-client privilege and the crime-fraud exception is that communications in furtherance of some sufficiently malignant purpose will not be protected. In determining whether to uphold the privilege, we should look to substance, not form. Thus, for example, it makes no sense and does not further the policy behind the privilege or its exception to protect communications in situations like the present case or to deny protection in trivial cases of technical crimes. *See,* Fried, *supra,* 64 N.C.L.Rev. at 445 ("the criminalization of numerous kinds of corporate misbehavior and of violations of administrative law has extended the reach of the exception.").

We now discuss the merits of the BT Counterclaim, using the objective standards for Rule 11 violations set forth above. Judge Martin stated in his opinion that the counterclaim "on its face does no more than assert that because Clifford signed a representation and warranty as to the location of the principal receivable records, Bankers was entitled to rely on the representation, and, therefore, he and the company would be liable to Bankers if it was ultimately established that the principle receivable records were in Vermont." SDNY opinion, at 125.

▆▆▆▆▆ We believe that the counterclaim was an objectively unreasonable pleading on its face, without reference to anything more. More particularly, we hold that it is, within the legal profession, conventionally preposterous for a lender to claim that it relied on the borrower to determine where to perfect its security interest. In addition, we hold, as

an independent ground, that when viewed in light of the underlying facts, the counterclaim is also objectively unreasonable.

The O'M & M Memo accurately states what the record shows:

> We are not sure when BT first learned that St. Johnsbury maintained an accounts processing and records storage facility in St. Johnsbury, Vermont. Although BT may not have known this information at the time it initially took a security interest in accounts receivable in 1986, however, BT certainly knew by the time the renewed representations and amended filings were made in 1989 and 1993.

O'M & M Memo, 2 n. 2. Because "BT certainly knew" that St. Johnsbury "maintained an accounts processing and records storage facility in St. Johnsbury, Vermont" at least as early as 1989, it could not have reasonably relied on Clifford's representation. Finally, we take issue with Judge Martin's characterization of the Counterclaim as representing a controversy about the location of the "principal" records. The Counterclaim, in fact, makes no such distinction. Rather, it appears from the record that this innovation was introduced by WSP & R when it entered the case. Although we do not know when WSP & R first began to represent BT, it entered its appearance in the Vermont Adversary in early May, 1994. With WSP & R's entry into the case, BT's pleadings and the deposition testimony of its witnesses began to attempt to deal with the reliance issue by segregating records into two classes—"controlling" or principal records and nonessential records. BT thereby sought to meet the force of the arguments by Clifford and the Plaintiffs that it could not have relied because it had prior knowledge. In essence, BT conceded that it knew nonessential records were maintained in Vermont, but argued that what was important was the location of the principal or controlling records. BT relied on Clifford's representation, BT argued, after the appearance of WSP & R, for the location of the principal records. There are several problems with this approach, which represents attorney spin control at its best or worst. First, the representation makes no distinction between control-

ling and other kinds of records. Second, the counterclaim itself makes no such distinction. Finally, the argument would be unavailing even if the representation and counterclaim supported the distinction later drawn, because practical business realities do not even remotely support the legal argument. It is, in the abstract, a neater, more legally plausible approach. In the real world, though, this argument is even more conventionally preposterous than its predecessor. It requires us to believe that BT, knowing that Debtor had records in both Massachusetts and Vermont, relied on Debtor to identify which records were controlling. This exercise would save BT the $6 Vermont filing fee on a deal involving many millions of dollars. As a factual matter, we don't believe BT did rely in any way on the representations. Even if BT did rely, such reliance was unreasonable. Indeed, we suspect that in a malpractice action by BT against its attorneys, BT would certainly prevail if O'M & M defended on the sole grounds that it had relied on the Clifford representation. For the foregoing reasons, we hold that the BT Counterclaim was an objectively unreasonable pleading, and that it is "patently clear" the counterclaim had "absolutely no chance of success." *Sussman, supra,* 56 F.3d at 457 (citations omitted).

 We also hold that the pleading was filed for an objectively improper purpose. As noted above, the Second Circuit requires that we not

> "delve into the attorney's subjective intent" in filing the paper, but rather ... assess such objective factors as
>
> > whether particular papers or proceedings caused delay that was unnecessary, whether they caused increase in the cost of litigation that was needless, or whether they lacked any apparent legitimate purpose. Findings on these points would suffice to support an inference of an improper purpose.

Based on our own litigation experience, our knowledge of the standards of the bar, and our familiarity with these proceedings, *Sussman, supra,* 56 F.3d at 458, we find that reasonable cause exists to believe that the

counterclaim lacked any legitimate purpose. Looking backward from where we sit today, the record in this adversary proceeding and in the main case in the Southern District of New York suggests strongly that BT and/or its counsel pursued a strategy that was intended to make adjudication of the Vermont Adversary prohibitively expensive in order to force a settlement on its terms. It also attempted to externalize the financial consequences of its own lawyers' failure to perform a simple legal task to Clifford and Debtor's directors and officers liability insurer. BT's assertion and defense of the counterclaim appear to us to have poisoned the proceedings in both forums, creating mistrust, miscalculation, and excessive litigation. Along the way, a settlement agreement and plan of reorganization were scuttled that appear in retrospect to have been more generous to unsecured creditors than the distributions now proposed.[20] That result flowed directly, we suspect, from the fact that BT allowed its former counsel to use the proceedings in both courts to try to insulate itself from the consequences of its own actions. The counterclaim produced major delay that was entirely unnecessary, wasted limited judicial resources in two venues, and drained off very significant resources that would otherwise have been available to creditors of the estate. If all of the resources spent by each of the parties and the court on just the counterclaim were totalled, we expect that it would amount to at least a million and perhaps millions of dollars. Accordingly, we find that there exists reasonable cause to believe that the counterclaim was filed for an objectively improper purpose.

The Sanctions Parties are to submit copies of all relevant documents to this Court for *in camera* review by Senior Bankruptcy Judge Charles J. Marro. We will request that Judge Marro review the documents to determine whether individual documents are within the privilege, and whether there is "a reasonable basis to suspect the perpetration or attempted perpetration" of a fraud upon the Court. *John Doe, supra,* 13 F.3d at 637.

Sanctions Counsel is to prepare an order consistent with the views expressed in this Memorandum of Decision.

20. This very point was raised as an objection to confirmation by an unsecured creditor.